2012 CO 25

**In the Matter of the TITLE, BALLOT TITLE, and SUBMISSION CLAUSE FOR 2011–2012 # 3**

**Douglas Kemper, Petitioner**

v.

**Richard G. Hamilton and Phillip Doe, Proponents, Respondents**

and

**William A. Hobbs, Jason Gelender, and Daniel Domenico., Title Board.**

No. 12SA8.

Supreme Court of Colorado, En Banc.

April 16, 2012.

---

Burns, Figa & Will, P.C., Stephen H. Leonhardt, Alix L. Joseph, Sarah M. Shechter, Greenwood Village, Colorado, Attorneys for Petitioner.

Richard G. Hamilton, Pro Se, Fairplay, Colorado.

John W. Suthers, Attorney General, Maurice G. Knaizer, Deputy Attorney General,

Denver, Colorado, Attorneys for Ballot Title Board.

No appearance by or on behalf of Phillip Doe.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this original proceeding under section 1–40–107(2), C.R.S. (2011), we review the Ballot Title Setting Board's ("Title Board") findings that proposed Initiative 2011–2012 No. 3 ("Initiative 3"), its title, and its ballot title and submission clause (the "Titles") contain a single subject.[1] We hold that the Title Board was correct. Initiative 3 and its Titles state a single subject—"the public's rights in the waters of natural streams"—and therefore comply with article V, section 1(5.5) of the Colorado Constitution and section 1–40–106.5, C.R.S. (2011). We therefore affirm the action of the Title Board.

## I. Facts and Procedural History

¶ 2 Respondents Richard G. Hamilton and Phillip Doe proposed Initiative 3 to enact the "Colorado public trust doctrine" by adding new subsections (2) through (7) to article XVI, section 5 of the state constitution. Specifically, proposed subsection (2) would expressly adopt a version of the public trust doctrine to "protect the public's interests in the water of natural streams and to instruct the State of Colorado to defend the public's water ownership rights of use and public enjoyment." Proposed subsections (3) and (4) would subordinate contract, property, and appropriative water rights to the "public estate in water." Proposed subsection (5) would allow public access "along, and on, the wetted natural perimeter" of any "natural stream in Colorado," and would extend this public access right to the "naturally

wetted high water mark of the stream." Proposed subsection (6) would provide enforcement mechanisms for the new public trust doctrine, and proposed subsection (7) would authorize the legislature to enact laws supplemental and complementary to the new constitutional provisions.

¶ 3 The Title Board designated the Titles for Initiative 3 in accordance with section 1–40–106(1), C.R.S. (2011), during a public meeting on December 21, 2011. The title reads as follows:

An amendment to the Colorado constitution concerning the *public's rights in the water of natural streams,* and, in connection therewith, making public ownership of such water legally superior to water rights, contracts, and property law; granting unrestricted public access along and use of natural streams and their stream banks up to the naturally wetted high water mark; prohibiting the state from transferring its water rights; allowing the state government to manage others' water rights, while requiring state government to act as steward of and to protect, enforce, and implement public ownership of water; and allowing any Colorado citizen to sue to enforce the amendment.

(Emphasis added).

¶ 4 The ballot title and submission clause contains the same language as the title, phrased in the form of a question. Petitioner Douglas Kemper filed a Motion for Rehearing on December 28, 2011, arguing that Initiative 3 and the Titles violated the single subject requirements of section 1–40–106.5 and of article V, section 1(5.5) of the Colorado Constitution. The Title Board heard testimony on the Motion for Rehearing during its meeting on January 4, 2012. It discussed

---

1. Petitioner Douglas Kemper presented the following two issues for our review:

A. Whether, in identifying the measure's subject in the Title as "the public's rights in waters of natural streams," the Board incorrectly determined that Initiative 2011–2012 # 3 is limited to a single subject, as required by Article V, section 1(5.5) of the Colorado Constitution and C.R.S. § 1–40–106.5, in light of the multiple objectives of this measure to:

1. Adopt the "Public Trust Doctrine" that would subordinate water rights to public ownership interests; and
2. Transfer real property adjacent to and beneath all natural streams from private landowners to the public.

B. Whether the Board's title and ballot title and submission clause for Initiative 2011–2012 # 3 is unfair in that the phrase "concerning the public's rights in the water of natural streams" does not clearly express a single subject.

the measure, and unanimously denied Kemper's objections, finding that both Initiative 3 and the Titles contained a single subject: "the public's rights in the waters of natural streams." Kemper seeks this Court's review of the Title Board's single subject findings pursuant to section 1–40–107(2).

## II. Analysis

¶ 5 We hold that the Title Board correctly found that Initiative 3 and its Titles contain a single subject because they necessarily and properly relate to "the public's rights in the waters of natural streams." We first describe our limited role in reviewing the Title Board's decision. We then outline Colorado's single subject rule, noting the dangers of omnibus initiatives. Finally, we analyze the plain language of Initiative 3 to conclude that it complies with the single subject rule. We also hold that the Titles fairly and clearly reflect the proposed measure and its single subject.

### A. Standard of Review

¶ 6 In reviewing a challenge to the Title Board's decision, "we employ all legitimate presumptions in favor of the propriety of the [Title] Board's actions." *In re Title, Ballot Title, Submission Clause for 2009–2010 No. 45*, 234 P.3d 642, 645 (Colo.2010). We will only overturn the Title Board's finding that an initiative contains a single subject in a clear case. *In re Title, Ballot Title and Submission Clause, and Summary Pertaining to the Casino Gaming Initiative Adopted on April 21, 1982*, 649 P.2d 303, 306 (Colo. 1982).

¶ 7 In addition, the Title Board has considerable discretion in setting the titles for a ballot initiative. *In re Title, Ballot Title, Submission Clause, and Summary Adopted March 20, 1996 by the Title Bd. Pertaining to Proposed Initiative "1996–6,"* 917 P.2d 1277, 1280 (Colo.1996). We will only reverse the Title Board's designation if the titles are "insufficient, unfair, or misleading." *In re Proposed Initiative 2009–2010 No. 45*, 234 P.3d at 648.

¶ 8 Our limited role in this process prohibits us from addressing the merits of a proposed initiative, and from suggesting how an initiative might be applied if enacted. *In re Title, Ballot Title and Submission Clause for Proposed Initiative 2001–02 No. 43*, 46 P.3d 438, 443 (Colo.2002). We will sufficiently examine Initiative 3, however, to determine whether or not it violates the constitutional prohibition against initiative proposals containing multiple subjects. *Id.; see also* Colo. Const. art. V, § 1(5.5). We will also examine the Titles as a whole to determine if they are fair, clear, accurate, and complete. *In re Proposed Initiative 2009–2010 No. 45*, 234 P.3d at 649; *In re Title, Ballot Title, and Submission Clause for 2007–2008 No. 62*, 184 P.3d 52, 58 (Colo.2008). During these examinations, we employ the general rules of statutory construction and accord the language of the proposed initiative and its titles their plain meaning. *In re Title, Ballot Title and Submission Clause, for 2007–2008, No. 17*, 172 P.3d 871, 874 (Colo.2007).

### B. The Single Subject Requirement

¶ 9 Colorado law requires "that every constitutional amendment or law proposed by initiative ... be limited to a single subject, which shall be clearly expressed in its title." § 1–40–106.5(1)(a); *see also* Colo. Const. art. V, § 1(5.5) ("No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title...."). A proposed initiative violates this rule if its text "relate[s] to more than one subject, and [has] at least two distinct and separate purposes not dependent upon or connected with each other." *People ex rel. Elder v. Sours*, 31 Colo. 369, 403, 74 P. 167, 177 (1903); *see In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 441 (describing use of *Sours* test to analyze ballot initiatives). As such, the subject matter of an initiative must be "necessarily and properly connected" rather than "disconnected or incongruous." *In re Title, Ballot Title, Submission Clause, and Summary Adopted April 5, 1995, by Title Bd. Pertaining to a Proposed Initiative "Pub. Rights in Waters II"*, 898 P.2d 1076, 1079 (Colo.1995).

¶ 10 A proponent's attempt to characterize a proposed initiative under "some overarching theme" will not save the measure if

it contains separate and unconnected purposes. *In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 442. We have held that "water" and "revenue changes" are two examples of "overarching themes" that did not qualify as single subjects when the proposed initiatives associated with the themes contained disconnected or incongruous provisions. *See Pub. Rights in Waters II*, 898 P.2d at 1080 (holding that "water" is too general and too broad to constitute a single subject); *see also In re Title, Ballot Title and Submission Clause, and Summary with Regard to a Proposed Petition for an Amendment to the Constitution of the State of Colo. Adding Subsection (10) to Section 20 of Article X (Amend TABOR 25)*, 900 P.2d 121, 125–26 (Colo.1995) (concluding that umbrella subject of "revenue changes" did not alter the fact that the measure contained two unrelated subjects—a tax credit and changes to the procedural requirements for ballot titles).

¶ 11 We have previously explained that the single subject rule prevents two "dangers" associated with omnibus initiatives. *See In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 442–43. First, combining subjects with no necessary or proper connection for the purpose of garnering support for the initiative from various factions—that may have different or even conflicting interests—could lead to the enactment of measures that would fail on their own merits. *Id.* at 442; *see* § 1–40–106.5(1)(e)(I). Second, the single subject rule helps avoid "voter surprise and fraud occasioned by the inadvertent passage of a surreptitious provision 'coiled up in the folds' of a complex initiative." *In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 442; *see* § 1–40–106.5(1)(e)(II).

¶ 12 Recognizing these dangers, we have applied the single subject rule to public trust doctrine initiatives—like Initiative 3—on several previous occasions. In 1995 and 2007, we held that the proposed public trust initiatives contained multiple subjects. *See Pub. Rights in Waters II*, 898 P.2d at 1077; *In re Proposed Initiative 2007–2008, No. 17*, 172 P.3d at 873. In *Public Rights in Waters II*, we applied the *Sours* test and determined that the proposed initiative violated the sin-

gle subject rule because no necessary connection existed between the measure's two water district election paragraphs and the two public trust water rights paragraphs. 898 P.2d at 1080. Citing *Public Rights in Waters II*, we similarly concluded in 2007 that a different proposed public trust doctrine initiative violated the single subject rule because the initiative improperly paired "the creation of a new environmental department with the separate and discrete subject of the creation of a public trust standard." *In re Proposed Initiative 2007–2008, No. 17*, 172 P.3d at 875. In 1996, however, we upheld the Title Board's finding that a proposed public trust doctrine initiative satisfied the single subject requirement because the subject—"the public's interest in state waters"—was "sufficiently narrow and sufficiently connected" with all of the proposed initiative's provisions. *In re Proposed Initiative 1996–6*, 917 P.2d at 1278–81.

¶ 13 With this legal framework in mind, we turn to Initiative 3 and its Titles.

### C. Initiative 3 and its Titles Contain a Single Subject

¶ 14 Initiative 3 and its Titles contain a single subject: "the public's rights in the waters of natural streams." Initiative 3's proposed subsections are necessarily and properly connected to this subject, *see Pub. Rights in Waters II*, 898 P.2d at 1079, and the Titles fairly and clearly express the single subject as well. *See In re Proposed Initiative 2007–2008 No. 62*, 184 P.3d at 58. We first analyze Initiative 3, and then address the Titles.

#### 1. Initiative 3 Complies with the Single Subject Rule

¶ 15 Initiative 3 contains a single subject. Proposed subsection (2) expressly adopts the "Colorado public trust doctrine." The plain language of Initiative 3 indicates that this proposed doctrine is necessarily and properly connected to the subject of "the public's rights in waters of natural streams" because the doctrine's delineated purpose is to "protect the *public's interests in the water of natural streams* and to instruct the state of Colorado to defend the public's water own-

ership rights of use and public enjoyment." (Emphasis added).

¶ 16 In addition, proposed subsections (3) through (5) are necessarily and properly connected to the subject of the "public's rights in waters of natural streams" because they describe the proposed doctrine's legal relationship to existing contract, property, and appropriative rights. Subsection (3) states that the new public right to water of natural streams would be "superior to rules and terms of contracts or property law." Then, subsections (4) and (5) necessarily and properly describe how the "superior" public right to the water of natural streams will interact with usufruct water rights and with streambed and stream bank access. Subsections (6) and (7) necessarily delineate the procedures for enacting and enforcing the new public trust regime to "protect the public's right and interest in water." Far from being "disconnected and incongruous," the proposed subsections of Initiative 3 have the single distinct purpose of describing a new legal regime—the "Colorado public trust doctrine"—that would govern "the public's rights in waters of natural streams." *See Pub. Rights in Waters II*, 898 P.2d at 1079.

¶ 17 Unlike "water" in *Public Rights in Waters II*, 898 P.2d at 1080, the "public's rights in waters of natural streams" is not "some overarching theme" that Initiative 3's proponents employed in an attempt to meld separate and unconnected purposes into a single subject. Rather, the "public's rights in waters of natural streams" describes the purpose of the "Colorado public trust doctrine" and relates to the other necessarily and properly proposed subsections of Initiative 3 describing the details of that doctrine. Just as "the public's interest in state waters" was "sufficiently narrow and sufficiently connected" with the proposed initiative's provisions in *In re Proposed Initiative 1996–6*, 917 P.2d at 1278–81, "the public's rights in waters of natural streams" is sufficiently narrow and sufficiently connected to the proposed constitutional amendment contained in Initiative 3.

¶ 18 Initiative 3 additionally does not present either of the "dangers" attending omni-

bus measures. First, the proponents did not combine an array of disconnected subjects into the measure for the purpose of garnering support from various factions. *See In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 442. Initiative 3 does not, for example, prescribe how to establish water district election procedures while also developing a "strong public trust doctrine," as did the multi-subject initiative in *Public Rights in Waters II*. 898 P.2d at 1080. Nor does it create a new environmental department while also proposing to enact a separate and discrete public trust doctrine. *See In re Proposed Initiative 2007–2008, No. 17*, 172 P.3d at 875. Rather, Initiative 3's proposed subsections all relate to the "Colorado public trust doctrine" and that doctrine's impact on the "public's rights in waters of natural streams."

¶ 19 Initiative 3 also fails to trigger the second "danger" of omnibus measures because voters will not be surprised by, or fraudulently led to vote for, any "surreptitious provision[s] 'coiled up in the folds' of a complex initiative." *In re Proposed Initiative 2001–02 No. 43*, 46 P.3d at 442. In *In re Proposed Initiative for 1997–98 No. 84*, 961 P.2d 456, 460 (Colo.1998), we held that a tax cut initiative contained multiple subjects because it proposed to not only cut taxes, but also to replace local revenue affected by these tax cuts "within all tax and spending limits." The phrase "within all tax and spending limits" required the state to replace local revenues by diverting funding from existing state programs. *In re Proposed Initiative for 1997–98 No. 84*, 961 P.2d at 460. We reasoned that voters would be surprised to learn that by voting for local tax cuts, they also had required the reduction, and possible elimination, of those state programs. *Id.* at 460–61.

¶ 20 No such surprise would occur should voters approve Initiative 3 because the plain language of the measure unambiguously proposes a new "Colorado public trust doctrine," describes the impact of that doctrine on other legal rights, and lays out procedures for implementing and enforcing the constitution-

al amendment.[2] Furthermore, Initiative 3 is not overly lengthy or complex, nor is the plain language confusing or otherwise misleading, as it was in the tax cut initiative case. *See id.* at 460; *Pub. Rights in Waters II,* 898 P.2d at 1079. As such, Initiative 3 complies with the single subject rule.

### 2. The Titles Clearly Express the Single Subject of Initiative 3

¶ 21 The Titles clearly express Initiative 3's single subject. They first explicitly state that Initiative 3 concerns "the public's rights in the water of natural streams," and then accurately and unambiguously summarize the details of the measure. Kemper argues that the Titles are unfair because the phrase "concerning the public's rights in the water of natural streams" does not clearly express a single subject. We held above that the phrase in question, as used in Initiative 3, contains a single subject in accordance with Colorado law. Therefore, we reject Kemper's argument because "the public's rights in the water of natural streams" is the single subject of Initiative 3 and is clearly and fairly expressed in the Titles. *See* Colo. Const. art. V, § 1(5.5); *see also* § 1–40–106(3)(b), C.R.S. (2011). Kemper has not argued any other grounds upon which we might conclude that the Titles are improper. Therefore, we affirm the designation of the Titles because they contain a single subject.

### III. Conclusion

¶ 22 We hold that Initiative 3 and its Titles contain a single subject in compliance with Colorado law. We therefore affirm the decision of the Title Board.

Justice HOBBS dissents.

APPENDIX—Initiative 3 and Titles

### INITIATIVE TO ADOPT THE COLORADO PUBLIC TRUST DOCTRINE

Be it Enacted by the People of the State of Colorado:

Section 5 of article XVI of the constitution of the state of Colorado is amended to read:

**Section 5. Water of streams public property—public trust doctrine.** (1) The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided.

(2) THIS COLORADO PUBLIC TRUST DOCTRINE IS HEREBY ADOPTED, AND IMPLEMENTED, BY THE PEOPLE OF THE STATE OF COLORADO TO PROTECT THE PUBLIC'S INTERESTS IN THE WATER OF NATURAL STREAMS AND TO INSTRUCT THE STATE OF COLORADO TO DEFEND THE PUBLIC'S WATER OWNERSHIP RIGHTS OF USE AND PUBLIC ENJOYMENT.

(3) THIS COLORADO PUBLIC TRUST DOCTRINE PROVIDES THAT THE PUBLIC'S ESTATE IN WATER IN COLORADO HAS A LEGAL AUTHORITY SUPERIOR TO RULES AND TERMS OF CONTRACTS OR PROPERTY LAW.

(4) THE PUBLIC CONFERS THE RIGHT TO THE USE OF ITS WATER, AND THE DIVERSION OF THE WATER UNDER SECTION 6 OF THIS ARTICLE, TO AN APPROPRIATOR FOR A BENEFICIAL USE AS A GRANT FROM THE PEOPLE OF THE STATE OF COLORADO TO THE APPROPRIATOR FOR THE COMMON GOOD.

(a) THE USE OF THE PUBLIC'S WATER BY THE MANNER OF APPROPRIATION, AS GRANTED IN THIS ARTICLE, IS A USUFRUCT PROPERTY RIGHT ASSOCIATED WITH THE USE OF WATER. USUFRUCT RIGHTS FOR THE USE OF WATER SURVIVE UNDER THE LEGAL CONDITION THAT THE APPROPRIATOR IS AWARE THAT A USUFRUCT RIGHT IS SERVIENT TO THE PUBLIC'S DOMINANT WATER ESTATE AND IS SUBJECT TO TERMS AND CONDITIONS OF THIS COLORADO PUBLIC TRUST DOCTRINE.

(b) USUFRUCT WATER RIGHTS SHALL NOT CONFER OWNERSHIP TO WATER OTHER THAN USUFRUCT RIGHTS TO THE APPROPRIATOR.

(c) USUFRUCT WATER RIGHTS, CONFERRED BY THE PUBLIC TO AN APPROPRIATOR FOR USE, MAY

---

**2.** We again emphasize that we may not opine on the merits of Initiative 3 nor may we suggest how the initiative might be applied if enacted. *In re Proposed Initiative 2001–02 No. 43,* 46 P.3d at

443. The effects this measure could have on Colorado water law if adopted by voters are irrelevant to our review of whether Initiative 3 and its Titles contain a single subject.

BE MANAGED BY THE STATE GOVERNMENT, ACTING AS A STEWARD OF THE PUBLIC'S WATER, SO AS TO PROTECT THE NATURAL ENVIRONMENT AND TO PROTECT THE PUBLIC'S ENJOYMENT AND USE OF WATER.

(d) A USUFRUCT WATER USER IS IMPRESSED UNDER THE CONDITION THAT NO USE OF WATER HAS DOMINANCE OR PRIORITY OVER NATURAL STREAMS OR PUBLIC HEALTH OR WELL-BEING.

(e) WATER RIGHTS, HELD BY THE STATE OF COLORADO FOR GOVERNMENT OPERATIONS, SHALL BE HELD IN TRUST FOR THE PUBLIC BY THE STATE OF COLORADO WITH THE STATE ACTING AS THE STEWARD OF THE PUBLIC'S WATER ESTATE. WATER RIGHTS HELD BY THE STATE OF COLORADO SHALL NOT BE TRANSFERRED BY THE STATE OF COLORADO FROM THE PUBLIC ESTATE TO PROPRIETARY INTEREST.

(5) ACCESS BY THE PUBLIC ALONG, AND ON, THE WETTED NATURAL PERIMETER OF A STREAM BANK OF A WATER COURSE OF ANY NATURAL STREAM IN COLORADO IS A RIGHT TO THE PUBLIC TO THE USE OF ITS OWN WATER IN CONCERT WITH THE COLORADO PUBLIC TRUST DOCTRINE.

(a) THE RIGHT OF THE PUBLIC TO THE USE OF THE WATER IN A NATURAL STREAM AND TO THE LANDS OF THE BANKS OF THE STREAMS WITHIN COLORADO SHALL EXTEND TO THE NATURALLY WETTED HIGH WATER MARK OF THE STREAM AND IS IMPRESSED WITH NAVIGATION SERVITUDE FOR COMMERCE AND PUBLIC USE AS RECOGNIZED IN THE COLORADO PUBLIC TRUST DOCTRINE.

(b) THE WATER OF A NATURAL STREAM AND ITS STREAMBED, AND THE NATURALLY WETTED LANDS OF THE SHORES OF THE STREAM, SHALL NOT BE SUBJECT TO THE LAW OF TRESPASS AS THE WATER OF NATURAL STREAMS AND THE BANKS OF THEIR STREAM COURSES ARE PUBLIC HIGHWAYS FOR COMMERCE AND PUBLIC USE.

(c) PUBLIC USE OF WATER, RECOGNIZED AS A RIGHT IN THE COLORADO PUBLIC TRUST DOCTRINE, SHALL NOT BE CONTROLLED IN LAW AS A USUFRUCT BUT SHALL BE A RIGHT OF THE PUBLIC TO PROTECT AND ENJOY ITS OWN WATER.

(6) ENFORCEMENT AND IMPLEMENTATION OF SUBSECTIONS (2) TO (7) OF THIS SECTION OF THE COLORADO PUBLIC TRUST DOCTRINE TO PROTECT THE PUBLIC'S RIGHTS AND INTERESTS IN WATER ARE MANDATED TO THE EXECUTIVE, LEGISLATIVE, AND JUDICIAL BRANCHES OF COLORADO STATE GOVERNMENT TO ACT AS STEWARDS TO PROTECT THE PUBLIC'S INTERESTS IN ITS WATER ESTATE. ANY CITIZEN OF THE STATE OF COLORADO SHALL HAVE STANDING IN JUDICIAL ACTIONS SEEKING TO COMPEL THE STATE OF COLORADO TO ENFORCE THE PROVISIONS OF THIS SECTION.

(7) SUBSECTIONS (2) TO (7) OF THIS SECTION ARE SELF-ENACTING AND SELF-EXECUTING, BUT LAWS MAY BE ENACTED SUPPLEMENTARY TO AND IN PURSUANCE OF, BUT NOT CONTRARY TO, THE PROVISIONS THEREOF.

PHILLIP DOE

LITTLETON, COLORADO

RICHARD HAMILTON

FAIRPLAY, COLORADO

### *Ballot Title Setting Board*

### Proposed Initiative 2011–2012 # 3

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning the public's rights in the water of natural streams, and, in connection therewith, making public ownership of such water legally superior to water rights, contracts, and property law; granting unrestricted public access along and use of natural streams and their stream banks up to the naturally wetted high water mark; prohibiting the state from transferring its water rights; allowing the state government to manage others' water rights, while requiring state government to act as steward of and to protect, enforce, and implement public ownership of water; and following any Colorado citizen to sue to enforce the amendment.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning the public's rights in the water of natural streams, and, in connection therewith, making public ownership of such water legally superior to water rights, contracts, and property law; granting unrestricted public access along and use of natural streams and their stream banks up to

the naturally wetted high water mark; prohibiting the state from transferring its water rights; allowing the state government to manage others' water rights, while requiring state government to act as steward of and to protect, enforce, and implement public ownership of water; and allowing any Colorado citizen to sue to enforce the amendment?

**Justice HOBBS, dissenting.**

¶ 23 I respectfully dissent. In my view, Initiative 2011–12 # 3 relates to more than one subject and it has at least two distinct and separate purposes that are not dependent upon or connected with each other. Accordingly, under our precedent in *Waters II*, we should hold that the Title Board erred in setting the Title and Ballot Title and Submission Clause for this initiative and remand the case to the Board with directions to strike them and return the initiative to its proponents. *In re Title, Ballot Title, Submission Clause & Summary Adopted April 5, 1995, by the Title Board Pertaining to a Proposed Initiative "Public Rights in Waters II"*, 898 P.2d 1076, 1080 (Colo.1995) (*Waters II*).

## I. Standard of Review

¶ 24 An initiative that joins multiple subjects poses the danger of voter surprise and fraud occasioned by the inadvertent passage of surreptitious provisions coiled up in the folds of a complex initiative. *In re Title, Ballot Title & Submission Clause, for 2007–2008, # 17*, 172 P.3d 871, 875 (Colo.2007) (*In re 2007–2008, # 17*). Grouping the provisions of a proposed initiative under a broad concept that potentially misleads voters will not satisfy the single subject requirement. *In re Proposed Initiative 1996–4*, 916 P.2d 528, 532 (Colo.1996). Multiple provisions fall under a single subject only if they have a "necessary and proper relationship." *In re Title, Ballot Title & Submission Clause, Summary Clause for 1997–1998 No. 74*, 962 P.2d 927, 929 (Colo.1998).

¶ 25 "[I]n order to pass the single-subject test, the subject of the initiative should be capable of being clearly expressed in the initiative's title." *In re Title, Ballot Title,*

*Submission Clause, Summary for 2005–2006 No. 73*, 135 P.3d 736, 738 (Colo.2006). It is our role to "consider whether the titles, summary, and submission clause reflect the intent of the amendment." *In re Proposed Initiative on Transfer of Real Estate to Amend Colorado Constitution by Adding a Section 9 to Article XVIII*, 200 Colo. 40, 43, 611 P.2d 981, 983 (1980). We reverse the Board's action in preparing them "if they contain a material and significant *omission*, misstatement, or misrepresentation." *In re Title, Ballot Title & Submission Clause & Summary for 1997–98 No. 62*, 961 P.2d 1077, 1082 (Colo.1998) (emphasis added). A title is unlawfully misleading if "voters ... could construe the titles" in a way incorrectly representing the text of the initiative. *In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 215*, 3 P.3d 11, 16 (Colo.2000). We reject titles if they "create confusion and are misleading because they do not sufficiently inform the voters" of important aspects of the initiative. *In re Title, Ballot Title & Submission Clause for Proposed Initiatives 2001–2002 No. 21 & No. 22 ("English Language Educ.")*, 44 P.3d 213, 221 (Colo.2002).

¶ 26 We must ensure that the Board's titles and summary enable "informed voter choice." *In re Title, Ballot Title, Submission Clause, Summary for 1999–2000 No.29*, 972 P.2d 257, 266 (Colo.1999). The titles and summary must "convey to voters the initiative's likely impact." *In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 37*, 977 P.2d 845, 846 (Colo.1999). They must protect against "public confusion." *In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 25*, 974 P.2d 458, 465 (Colo.1999). They must "enable the electorate, whether familiar or unfamiliar with the subject matter of a particular proposal, to determine intelligently whether to support or oppose such a proposal." *In re Proposed Election Reform Amendment*, 852 P.2d 28, 33 (Colo.1993).

¶ 27 The Board must "avoid titles for which the general understanding of a 'yes' or 'no' vote will be unclear." *In re Title, Ballot Title & Submission Clause & Summary Approved April 6, 1994, & April 20, 1994, for*

*the Proposed Initiative Concerning "Auto. Ins. Coverage"*, 877 P.2d 853, 855 (Colo.1994).

¶ 28 Just as "water" was too broad a theme in *Waters II*, 898 P.2d at 1080, to unite multiple subjects into a single subject, this initiative grouped under the title "the Colorado Public Trust Doctrine" fails, in my view, to meet the single subject requirements of article V, section 1(5.5) of the Colorado Constitution and the Title Board's enabling statute, section 1–40–106.5(1)(a), C.R.S. (2011).

## II. Initiative 2011–12 # 3 Surreptitiously Contains Multiple Purposes and Subjects in Contravention of Colorado's Constitution

¶ 29 We have a duty to determine whether a proposed initiative the Title Board has approved for the ballot contains cleverly concealed multiple purposes under a seductively-stated broad title. *In re 2007–2008, # 17*, 172 P.3d at 875; *see also In re Title, Ballot Title & Submission Clause for 2009–2010 # 91*, 235 P.3d 1071, 1076 (Colo.2010). Here, the initiative states that its purpose is to "protect the public's interests in the water of natural streams and to instruct the state of Colorado to defend the public's water ownership rights and public enjoyment." To that end, the initiative further states that the right to use and divert the public's water for beneficial use is a "grant from the people of the state of Colorado to the appropriator for the common good."

¶ 30 In reciting this purpose, the initiative is consistent with 150 years of Colorado constitutional, statutory and case decision water law. In *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147 (Colo.2001), we held that Colorado's prior appropriation system centers on three fundamental principles:

(1) waters of the "natural stream," (the term used in article XVI, section 5 of the Colorado Constitution), includes both surface water and tributary groundwater as a public resource that is subject to the establishment of public agency or private use rights in unappropriated water for beneficial purposes;

(2) water courts adjudicate the water rights and their priorities; and

(3) the State Engineer, Division Engineers, and Water Commissioners administer the waters of the natural stream in accordance with the judicial decrees and statutory provisions governing administration.

¶ 31 Thus, a casual reading of Initiative 2011–12 # 3 could lead a voter to vote for the initiative as a reaffirmation of Colorado's longstanding water law doctrine, which provides that the water resource is always owned by the public, subject to adjudication and administration of use rights created in priority through appropriations of unappropriated water by public and private entities. However, within the folds of this complex initiative are coiled three separate and discrete subjects that are not dependent upon or necessarily connected with each other. Any one of these subjects might lead a voter to vote for the initiative even though the voter does not favor one or more of the other subjects. This is precisely the logrolling dilemma that the voters intended to avoid when they adopted the single subject requirements of article V, section 1(5.5) of the Colorado Constitution. *In re Title, Ballot Title & Submission Clause for 2009–2010 # 91*, 235 P.3d 1071, 1079 (Colo.2010); *In re Title, Ballot Title & Submission Clause for 2009–2010, # 24*, 218 P.3d 350, 353 (Colo. 2009). It also violates the requirements that an initiative must not potentially mislead voters, that its title must not misrepresent or insufficiently inform voters so as to create confusion, and that it convey the initiative's likely impact so as to enable voter choice.

¶ 32 First, Initiative 2011–12 # 3 would subordinate all existing water rights in Colorado created over the past 150 years to a newly created dominant water estate, the purpose of which is "to protect the natural environment and to protect the public's enjoyment and use of water." This provision would create a super water right for such purposes. Under current Colorado law, environmental and recreational uses are subject to appropriation in priority by the Colorado Water Conservation Board for instream flow and lake level water rights under section 37–92–102(3), C.R.S. (2011), and by local governmental entities for recreational in-channel

water rights under sections 37–92–103(10.3), 37–92–102(6)(b), and 37–92–305(13), C.R.S. (2011).

¶ 33 Second, Initiative 2011–12 # 3 would subject the "lands of the banks of the streams within Colorado" to a newly created "navigation servitude for commerce and public use" extending to "the naturally wetted high water mark of the stream." This provision would vest in the public possessory rights to the beds and banks of the stream now owned by local public entities and private landowners in Colorado.

¶ 34 Third, Initiative 2011–12 # 3 would create a new property right of "access by the public" to "any natural stream in Colorado." This provision would vest a recreational easement in the public across all private property in Colorado through which even a trickle of water runs. It would abrogate the right of private property owners throughout Colorado to prohibit trespass onto and across their land.

¶ 35 These three subject matters separately and together propose to drop what amounts to a nuclear bomb on Colorado water rights and land rights. Masquerading as a measure to protect the public, Initiative 2011–12 # 3 contains surreptitious measures that would strip members of the public, cities, farms, and families throughout this state of their most valuable economic interests.

## III. The Initiative Improperly Lumps Land and Water Interests Together in Derogation of the Historical and Doctrinal Framework of Public Trust Law

¶ 36 In *People v. Emmert*, 198 Colo. 137, 141, 597 P.2d 1025, 1027 (1979), we ruled that the banks and beds of non-navigable streams in Colorado are not owned by the State of Colorado or the public at large but, rather, by the adjoining landowners. We also ruled that Colorado courts will not impose a public trust theory to resolve the issue of recreational use of the public's water resource as it runs through the beds and banks of the stream. These are two different subjects.

¶ 37 As a recent U.S. Supreme Court decision holds, federal law determines whether a state takes riverbed title under the equal footing doctrine when the state is admitted to the Union; on the other hand, the existence and scope of the public trust doctrine in any given state for public access to that land is for the state to determine. *PPL Montana, LLC v. Montana*, —— U.S. ——, 132 S.Ct. 1215, 1227–28, 1234–35, 182 L.Ed.2d 77 (2012) ("Under accepted principles of federalism, the states retain residual power to determine the scope of the public trust over waters within their borders, while federal law determines riverbed title under the equal-footing doctrine.").

¶ 38 The public trust doctrine originated with English common law, ultimately deriving from the Roman law that the seas were common to all. As most land owned in England came from grants from the Crown, there became recognized a presumption that the Crown, in granting lands near seashores, did not grant tidelands, but reserved them against private ownership. This presumption extended to navigable, tidal lands. It came to be understood that the Crown held these lands in trust for the public rights of fishery and navigation.

¶ 39 The United States adopted this common law understanding, more or less intact, in *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). There, the Court held that the states, as sovereigns, took title to the tidelands from the Crown at the time of the American Revolution. 152 U.S. at 16, 14 S.Ct. 548. New states took title to their submerged lands and tidelands upon statehood, under the equal footing doctrine. *Id.* at 27–28, 14 S.Ct. 548. Federal law explains that the states own these lands—specifically, lands beneath waters which were navigable at the moment of state sovereignty—in trust for their people, but it does not dictate how states are to manage these lands. State law determines whether the public effectively has an easement over these lands for public trust purposes, whether the state may dispose of the lands through grants to private parties, whether private landowners have always held the lands, or whether some other regime is effective. *See PPL Montana*, 132 S.Ct. at 1234–35.

¶ 40 Beginning with New Mexico in 1945, *infra,* some state courts began to hold that the public has the right to use waters for fishing and navigation regardless of title and regardless of whether the waters were ever navigable for title, because water is a public resource. The Mono Lake case in California connected this public right to the public trust doctrine, holding that the state's "supervisory control over its navigable waters and the lands beneath those waters," a principle "fundamental to the concept of the public trust, applies to rights in flowing waters as well as to rights in tidelands and lakeshores." *Nat'l Audubon Soc'y v. Superior Court,* 33 Cal.3d 419, 189 Cal.Rptr. 346, 658 P.2d 709, 727 (1983). However, fundamental to the court's reasoning was a California constitutional provision that, as the court held, all uses of water must "conform to the standard of reasonable use." *Id.* This concept, which makes California a "hybrid" riparian/prior appropriation state, has never been the law in Colorado's "pure" prior appropriation system. The California standard, the court held, requires that the state government consider public trust interests in determining consumptive water rights. *Id.* at 726.

¶ 41 This indicates that California's extension of the public trust doctrine was a melding of that doctrine with the reasonable use doctrine endemic to riparian water law. Earlier decisions, beginning with the 1945 New Mexico case, provide a more relevant explanation for opening all waters to fishing and recreation. There, the court traced the public right to Native American and Mexican law, and to Colorado's *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443 (1882), holding that prior appropriation, in superseding the common law, places unappropriated waters into public ownership. *State ex rel. State Game Comm'n v. Red River Valley Co.,* 51 N.M. 207, 182 P.2d 421, 432 (1945) ("The doctrine of the Common Law as to the private owner-

ship of the water of public streams no longer exists in this Territory or the mountain states and no longer can there be such a thing as private ownership of the water of public streams in this Territory." (emphasis omitted)).

¶ 42 In concordance with Mexican law, the public therefore had a right to fish these public waters. *Id.* at 433. Wyoming, Idaho, and South Dakota followed the New Mexico opinion, holding public use of the waters themselves to sound in constitutional provisions and the Colorado doctrine rather than the common law public trust doctrine. *See S. Idaho Fish & Game Ass'n v. Picabo Livestock, Inc.,* 96 Idaho 360, 528 P.2d 1295 (1974); *Day v. Armstrong,* 362 P.2d 137 (Wyo.1961). The Wyoming decision contains the following representative language: "There seems to be no considerable difference between dividing the ownership and use of lands beneath waters from the ownership and use of waters upon or flowing over or across that land than there is in the horizontal division in land ownership such as not infrequently occurs in ownership of surface and subsurface areas." *Day v. Armstrong,* 362 P.2d 137, 145 (Wyo.1961). This strongly suggests that land ownership, the sine qua non of the historical public trust doctrine, is irrelevant to public ownership of waters.[1]

¶ 43 Our *Park County Sportsmen's Ranch* decision explains Colorado's rubrics that "water is a public resource" and "the waters of the natural stream" include "tributary ground water." *Bd. of Cnty. Comm'rs of Cnty. of Park v. Park County Sportsmen's Ranch, LLP,* 45 P.3d 693, 696, 706, 709 (Colo. 2002). Relying on Territorial statutes and the appropriation provisions of the Colorado Constitution, we have held since Territorial days that Colorado law wholly replaced the riparian and *cujus* common law ownership doctrines, which tie water use rights to ownership of property abutting the stream or land overlying an aquifer.[2] This break from

1. While some states—namely, California, Hawaii, Montana, and South Dakota—have nominally included water use and allocation within their "public trust doctrines," their holdings were based on constitutional provisions which they held embodied the public trust doctrine, and not simply on a direct application of the common law doctrine. *See Parks v. Cooper,* 676 N.W.2d 823, 835–39 (S.D.2004); *In re Water Use Permit Applications,* 94 Hawai'i 97, 9 P.3d 409, 443–44 (2000) (*Waiahole Ditch Case*); Montana Coal. for Stream Access, Inc. v. Curran, 210 Mont. 38, 682 P.2d 163, 170–71 (1984); *Nat'l Audubon,* 189 Cal.Rptr. 346, 658 P.2d at 726.

2. "To whomsoever the soil belongs, he owns also to the sky and to the depths." *Park County*

the common law was so complete as to make all surface water and groundwater in the state, along with the water-bearing capacity of streams and aquifers, a public resource dedicated to the establishment and exercise of water use rights created in accordance with applicable law. The "Colorado Doctrine" arose from the "imperative necessity" of water scarcity in the western region, and includes these features:

> (1) water is a public resource, dedicated to the beneficial use of public agencies and private persons wherever they might make beneficial use of the water under use rights established as prescribed by law;
>
> (2) the right of water use includes the right to cross the lands of others to place water into transportation systems, occupy and convey water through those lands, and withdraw water from the natural water-bearing formations; and
>
> (3) the natural water-bearing formations may be used for the transport and retention of appropriated water.

This radically new law of the arid region created a property-rights-based allocation and administration system that promotes multiple use of a finite resource for beneficial purposes. *Id.* at 706.

¶ 44 In so holding, we relied on statutory provisions adopted by the first Colorado Territorial General Assembly in 1861[3] and a series of United States Congress public domain acts, including the 1866 Mining Act[4] and subsequent acts. Together, these past state and federal acts had

> (1) effectuated a severance of water from the land patents issuing out of the public domain;

*Sportsmen's Ranch*, 45 P.3d at 696 n. 1 (translating the *cujus* doctrine).

3. *See* 1861 Colo. Sess. Laws 67–68.

4. Mining Act of 1866, ch. 262, § 9, 14 Stat. 251, 253 (1866); *see* 43 U.S.C. § 661 (2006).

5. *Park County Sportsmen's Ranch*, 45 P.3d at 706 n. 21.

6. There is much dicta in the *Emmert* decision. The common ground of agreement between the majority and dissent in *Emmert* rests in the majority's statement that, "If the increasing demand for recreational space on the waters of this state

> (2) confirmed the right of the states and territories to recognize rights to water established prior to the federal acts; and
>
> (3) granted the right to states and territories to legislate in regard to water and water use rights.[5]

¶ 45 In sum, public water ownership and public submerged-land ownership evolved under completely different circumstances and completely different legal regimes. As such, they cannot be considered a single subject. In *Emmert*, we ruled both that the public trust doctrine in Colorado did not divest landowners of lands beneath non-navigable waters and that Colorado's constitutional doctrine vesting unappropriated waters with the public did not create a public right of navigation. 198 Colo. at 142, 597 P.2d at 1028 (citing *Hartman v. Tresise*, 36 Colo. 146, 149–50, 84 P. 685, 686 (1906), for the proposition that non-navigable stream beds are private land). While we discussed both the land and water issues, they are discrete and separate subjects historically and doctrinally.[6]

¶ 46 Initiative 2011–2012 # 3 appears to seek to overturn all aspects of *Emmert*, and goes farther by creating a "public trust" not only in all water rights in the state, as with California's *Mono Lake* case, but also in all natural stream beds regardless of navigability, which would be a novelty among jurisdictions in the United States.

## IV. The Board's Title and Summary Will Confuse Voters

¶ 47 The Board's ballot title and submission clause provide:

is to be accommodated, the legislative process is the proper method to achieve this end." 198 Colo. at 143, 597 P.2d at 1029. Justice Carrigan's dissent agrees with this proposition: "The majority opinion expressly acknowledges that 'it is within the competence of the General Assembly to modify rules of common law within constitutional parameters.'" 198 Colo. at 149, 597 P.2d at 1033. Accordingly, as a legislative matter, the people could address the recreational use of the public's water resource through an initiated constitutional amendment or statute that is presented as one subject. The initiative now before us does not accomplish this.

Shall there be an amendment to the Colorado constitution concerning the public's rights in the water of natural streams, and, in connection therewith, making public ownership of such water legally superior to water rights, contracts, and property law; granting unrestricted public access along and use of natural streams and their stream banks up to the naturally wetted high water mark; prohibiting the state from transferring its water rights; allowing the state government to manage others' water rights, while requiring state government to act as steward of and to protect, enforce, and implement public ownership of water; and allowing any Colorado citizen to sue to enforce the amendment?

¶ 48 This contains at least two material omissions. First, it neglects to mention that it effectively will grant to the public possessory interests in *land* currently owned by private entities and individuals. Buried in the several clauses is a note that "public access" will be allowed on "stream banks." But this will mislead voters by failing to "convey to voters the initiative's likely impact," *In re Title, Ballot Title & Submission Clause & Summary for 1999–2000 No. 37*, 977 P.2d at 846, namely: that it will deprive landowners of their currently established property rights to land through which any sized stream runs. Any reader not already familiar with the intent of the initiative would much more likely believe that the initiative refers only to navigable streams, or only streams on public land. This omission of critical information will create voter confusion and make it possible for voters to misconstrue the initiative's purpose.

¶ 49 Second, the title omits any mention of the public trust doctrine or its implications. While it notes that the initiative would make "public ownership of such water legally superior to water rights," voters will inevitably confuse this concept with the principle already inherent in Colorado doctrine that waters of natural streams are public property dedicated to the people of the state. *See* Colo. Const. art. XVI, § 5. Individuals own rights to divert and use water of natural streams, but the water itself while in the natural stream has always been owned by the public.

¶ 50 Because of these omissions, and the structure and complexity of the ballot title and submission clause, it will be unclear to voters what a "yes" or "no" vote would do. *In re Title, Ballot Title & Submission Clause & Summary Approved April 6, 1994, & April 20, 1994, for the Proposed Initiative Concerning "Auto. Ins. Coverage"*, 877 P.2d at 855 (Colo.1994). Exacerbating this problem is the misleading characterization in the title that the initiative concerns only the "public's rights in the water of natural streams," as the initiative concerns land as well.

¶ 51 The underlying force behind all of this confusing language is that the initiative has not one but three subjects. The ballot title fails on the rule that, "in order to pass the single-subject test, the subject of the initiative should be capable of being clearly expressed in the initiative's title." *In re Title, Ballot Title, Submission Clause, Summary for 2005–2006 No. 73*, 135 P.3d at 738. Whatever else the title may be, it is not clear. It struggles to encompass the numerous aspects and impacts of the initiative, but ultimately does not enable the electorate to make an intelligent determination. The surreptitious subjects and provisions coiled up in this provision have effectively escaped the public notice which it is the Title Board's duty to ensure. As the history of public trust doctrine and Colorado doctrine illuminate, they involve matters with no necessary and proper connection.

### Conclusion

¶ 52 Contrary to the plain teachings of the United States Supreme Court in the *PPL Montana* case and many ballot title decisions of our court, this initiative combines the separate subject of (1) subordinating all water rights in Colorado to a new super water right for environmental and recreational uses with the separate subject of (2) vesting in the public possessory rights to the beds and banks of the streams in this state now owned by private landowners with the separate subject of (3) creating a public access easement for recreation across the private property of

Colorado landowners, usurping the ability of landowners to prevent trespass across their property.

¶ 53 Initiative 2011–12 # 3, and the subject the Title Board identified in approving it— "the public's rights in the water of natural streams"—can cause voter surprise and fraud by the inadvertent passage of surreptitious provisions coiled up in the folds of a complex initiative. In my view, we have a duty under article V, section 1(5.5) of the Colorado Constitution and the Title Board's enabling statute, section 1–40–106.5(1)(a), to reverse the Title Board's action in setting the title for this initiative.

¶ 54 Accordingly, I respectfully dissent.