Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 30, 2017

**2017 CO 57**

**No. 17SA6, In the Matter of the Title, Ballot Title and Submission Clause for 2017–2018 #4—Single Subject—Fiscal Impact Statement Abstract—Standard of Review.**

The supreme court holds that Initiative #4 contains a single subject: limiting housing growth in Colorado. The supreme court also considers, for the first time, its authority to review an abstract prepared pursuant to section 1-40-105.5, C.R.S. (2016), and the proper standard to apply when reviewing such an abstract. The supreme court holds that section 1-40-107, C.R.S. (2016), grants the supreme court reviewing authority, and the proper standard of review is the same standard the supreme court applies to the single-subject and clear-title requirements—that is, the supreme court draws all legitimate presumptions in favor of the propriety of the Title Board's decision and will only overturn the Title Board's decision in a clear case. Under that standard, the supreme court upholds the Title Board's approval of the abstract at issue in this case. Therefore, the supreme court affirms the actions of the Title Board.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

### 2017 CO 57

---

**Supreme Court Case No. 17SA6**
*Original Proceeding Pursuant to § 1-40-107(2), C.R.S. (2016)*
Appeal from the Ballot Title Setting Board

---

In the Matter of the Title, Ballot Title and Submission Clause for 2017–2018 #4

**Petitioners:**

Scott E. Smith and D. Michael Kopp,

v.

**Respondents:**

Daniel Hayes and Julianne Page,

and

**Title Board:**

Suzanne Staiert, Sharon Eubanks, and Glenn Roper.

---

**Title Board Action Affirmed**
*en banc*
May 30, 2017

---

**Attorneys for Petitioner Scott E. Smith:**
Recht Kornfeld, P.C.
Mark G. Grueskin
  *Denver, Colorado*


**Attorneys for Petitioner D. Michael Kopp:**
Brownstein Hyatt Farber Schreck LLP
Jason R. Dunn
David B. Meschke
  *Denver, Colorado*


**Attorneys for Title Board:**
Cynthia H. Coffman, Attorney General

LeeAnn Morrill, First Assistant Attorney General
  *Denver, Colorado*

No appearance on behalf of Respondents.

**JUSTICE EID** delivered the Opinion of the Court.

¶1     Pursuant to section 1-40-107, C.R.S. (2016), petitioners Scott E. Smith and D. Michael Kopp ("Petitioners"), both registered electors, appeal the actions of the Ballot Title Setting Board ("Title Board") regarding the setting of the title and ballot title and submission clause for Proposed Initiative 2017–2018 #4 ("Initiative #4") (for tracking purposes, captioned "Limit on Local Housing Growth").[1] First we consider whether Initiative #4 contains a single subject and conclude that it does—namely, the limitation of housing growth in Colorado. Further, we consider, for the first time, our authority to review an abstract prepared and submitted to the Title Board as required by section 1-40-105.5, C.R.S. (2016). We hold that section 1-40-107 authorizes this court to review such an abstract. We apply the same standard of review that we apply to the single-subject and clear-title requirements—that is, we draw all legitimate presumptions in favor of the propriety of the Title Board's decision and only overturn the Board's decision in a clear case. Under this standard, we uphold the Title Board's approval of the abstract at issue here. We therefore affirm the actions of the Title Board.

**I.**

¶2     Respondents Daniel Hayes and Julianne Page are the designated proponents of Initiative #4, which aims to limit housing growth in Colorado. Initiative #4 would amend the Colorado Constitution by adding a new section to article XVIII, titled "Colorado growth limitation." The new section would give every "city, town, city and county, or local county" the right to limit housing growth by initiative and referendum.

---

[1] The text is attached as Appendix A. The abstract, which Petitioners also challenge, is attached as Appendix B.

3

It would also cap annual housing growth at one percent in ten jurisdictions for the years 2019 and 2020,[2] after which time the growth limitation could be amended or repealed by initiative and referendum, and it would prohibit the issuance of permits to build new, privately owned residential housing units in the same ten jurisdictions until January 1, 2019. Initiative #4 also provides signature requirements for initiatives and referenda undertaken pursuant to the new section and outlines procedures for challenging initiatives.

¶3 The Title Board first denied title setting, finding that the initial version of Initiative #4 did not contain a single subject.[3] The Title Board held a public hearing on a revised version of Initiative #4 on December 21, 2016. At that hearing, the Board granted single-subject approval and set a title. It also approved an initial fiscal impact statement and abstract for the Initiative, which were prepared pursuant to a Colorado statute that took effect in March 2016 and requires fiscal impact statements for every measure submitted to the Title Board, see § 1-40-105.5(2)(a).

¶4 Petitioners Scott E. Smith and D. Michael Kopp each filed a petition for rehearing, contending that Initiative #4 contained multiple subjects, the title was misleading, and the abstract failed to meet the requirements of section 1-40-105.5(3). The Title Board held a rehearing on January 4, 2017, at which it amended the title and denied both rehearing petitions in all other respects.

---

[2] The jurisdictions specified in Initiative #4 are the cities and counties of Broomfield and Denver, and the counties of Adams, Arapahoe, Boulder, Douglas, El Paso, Jefferson, Larimer, and Weld.

[3] The initial version contained a provision on affordable housing.

¶5 Petitioners each sought review by this court of the Title Board's actions.[4] Specifically, Petitioners contend that (1) Initiative #4 contains multiple subjects, and (2) the abstract fails to comply with the requirements set forth in section 1-40-105.5(3).

## II.

## A.

¶6 The Colorado Constitution provides that no constitutional amendment or law "shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title." Colo. Const. art. V, § 1(5.5); see also § 1-40-106.5(1)(a), C.R.S. (2016) (stating the constitutional single-subject requirement). In reviewing Title Board decisions, "we employ all legitimate presumptions in favor of the propriety of the Board's actions." In re Title, Ballot Title and Submission Clause for 2013–2014 #90, 2014 CO 63, ¶ 7, 328 P.3d 155, 158. "We will only overturn the Title Board's finding that an initiative contains a single subject in a clear case." Id. In our limited review, we examine the wording of a proposed initiative to determine whether it comports with the constitutional single-subject requirement. Id. at ¶ 9, 328 P.3d at 159. We do not address the merits of a proposed initiative or suggest how it might be applied if enacted. Id.; In re Title, Ballot Title, and Submission Clause for 2011–2012 #3, 2012 CO 25, ¶ 8, 274 P.3d 562, 565.

¶7 The single-subject requirement functions to prevent two dangers: (1) "logrolling," or the practice of "combining subjects with no necessary or proper

---

[4] The Title Board contends that Petitioner Kopp's petition to this court was not timely filed. Although it does not affect our analysis, because both petitions address the same issues, we note that Petitioner Kopp's petition was originally timely filed.

connection for the purpose of garnering support for the initiative from various factions—that may have different or even conflicting interests—[in order to] lead to the enactment of measures that would fail on their own merits"; and (2) voter surprise and fraud caused by the "passage of a surreptitious provision 'coiled up in the folds' of a complex initiative." In re 2011–2012 #3, ¶ 11, 274 P.3d at 566 (quoting In re Title, Ballot Title and Submission Clause for Proposed Initiative 2001–02 #43, 46 P.3d 438, 442 (Colo. 2002)); see also § 1-40-106.5(1)(e). Accordingly, the subject matter of a proposed initiative "must be necessarily and properly connected rather than disconnected or incongruous." In re 2013–2014 #90, ¶ 11, 328 P.3d at 159 (quoting In re 2011–2012 #3, ¶ 9, 274 P.3d at 565). An initiative violates the single-subject requirement if it "relates to more than one subject and has at least two distinct and separate purposes." Id.

¶8    We have held repeatedly that where a proposed initiative "tends to effect or to carry out one general objective or purpose," it presents only one subject. In re Title, Ballot Title and Submission Clause, and Summary for 1999–00 #256, 12 P.3d 246, 253 (Colo. 2000) (quoting In re Title, Ballot Title and Submission Clause, and Summary for 1999–2000 #25, 974 P.2d 458, 463 (Colo. 1999)); accord In re 2013–2014 #90, ¶ 11, 328 P.3d at 159. Additionally, an initiative does not violate the single-subject requirement simply because it contains provisions necessary to effectuate its purpose. See In re 2013–2014 #90, ¶ 11, 328 P.3d at 159. Rather, so long as they are interrelated, such provisions "are properly included within [the initiative's] text." Id.; see also In re Title, Ballot Title and Submission Clause for 2009–2010 #45, 234 P.3d 642, 646 (Colo. 2010) ("An initiative may contain several purposes, but they must be interrelated . . . .

6

Implementing provisions that are directly tied to the initiative's central focus are not separate subjects." (Citation omitted)). In reviewing the Title Board's actions, we remain mindful of our limited role and construe the single-subject requirement liberally to avoid unduly restricting the initiative process. In re 2013–2014 #90, ¶ 12, 328 P.3d at 160.

¶9 Here, Petitioners contend that Initiative #4 contains multiple subjects. Petitioners assert that subsection 1 of Initiative #4 creates a new county right of initiative and restricts the governance power of home-rule municipalities, which they claim are subjects distinct from the one-percent annual limit on housing growth established in subsection 2. They argue further that subsection 4 enacts a "change to the initiative process itself," and thus constitutes yet another separate subject. We disagree.

¶10 We hold that Initiative #4 contains a single subject: limiting housing growth in Colorado. Subsections 2 and 3 limit housing growth to one percent annually in ten jurisdictions until 2021 and prohibit permits for new residential housing units in the same jurisdictions until 2019. Both provisions "tend to . . . carry out [the] one general objective" of limiting housing growth in Colorado by providing a means for reducing the number of new homes built. The provisions are thus interrelated and necessarily and properly connected to the subject of limiting housing growth in Colorado. See, e.g., In re 2009–2010 #45, 234 P.3d at 647 (finding provisions "seek[ing] to achieve the central purpose of the initiative" to be "directly connected and related" to the initiative's single purpose).

7

¶11     Subsection 1 designates who has authority under Initiative #4 to enact, alter, and repeal regulations on housing growth—namely, the "electors of every city, town, city and county, or local county, whether statutory or home rule." The possibility that subsection 1 might alter the power of home-rule municipalities does not render it a distinct and separate subject. See In re 2013–2014 #90, ¶ 18, 328 P.3d at 161. To the contrary, the identification of who may act under an initiative is necessarily and properly connected to the initiative's central subject. See id. ("The designation of the government entities that hold the regulatory power authorized under the initiative[] is necessarily and properly connected to the central purpose of the measure[].") Additionally, to the extent subsection 1 might affect the rights of home-rule municipalities, it would do so only in the context of local proposals to regulate housing growth. Cf. id. Thus, subsection 1 is not a "disconnected or incongruous" attempt to shift voting powers broadly, but rather is "properly connected to" the central goal of limiting housing growth in Colorado.

¶12     Finally, subsection 4 establishes a signature requirement for proposals to regulate the growth of privately owned residential housing and outlines procedures for challenging signatures and the form and content of a petition. Contrary to Petitioners' claims that it constitutes a fundamental change to the initiative process, subsection 4 provides for the implementation of Initiative #4 and is thus "directly tied to the initiative's central focus."

¶13     Subsection 4 is titled "Initiative and referendum for this section." Thus, the plain language of subsection 4 limits its application to initiatives and referenda undertaken

pursuant to Initiative #4. Substantively, subsection 4 provides procedures for implementing the initiative and referendum requirements detailed in subsections 1 and 2. It is therefore interrelated with and properly connected to the other provisions of Initiative #4. It is also necessary to effectuate Initiative #4's central purpose of limiting housing growth, as it sets forth initiative and referendum procedures for entities seeking to regulate housing growth that may not have such procedures in place. Because subsection 4 is an "[i]mplementing provision[] that [is] directly tied to the initiative's central focus," it is not a separate subject and is properly included in the text of Initiative #4. In re 2009–2010 #45, 234 P.3d at 646; see also In re 2013–2014 #90, ¶ 11, 328 P.3d at 159.

¶14 Initiative #4 does not present either of the dangers the single-subject requirement seeks to prevent. There is no threat of logrolling here, because those who favor limits on housing growth would also favor establishing procedures through which electors may implement those limits. All aspects of Initiative #4 are interrelated and point in the same direction—limiting housing growth in Colorado. Likewise, voters will not be surprised by provisions "coiled up in the folds" of Initiative #4. Initiative #4 does not, for example, simultaneously add to, repeal, replace, and preempt existing constitutional and statutory provisions, as did the recall initiative in In re Title, Ballot Title, and Submission Clause for 2013–2014 #76, 2014 CO 52, ¶¶ 4, 33, 333 P.3d 76, 78, 85. Initiative #4 would add one section to the Colorado Constitution, it is not overly lengthy or complex, and its plain language is not confusing. Thus, Initiative #4 complies with the single-subject requirement.

**B.**

¶15 In this opinion we also consider, for the first time, whether we have the authority to review an abstract prepared and submitted to the Title Board pursuant to section 1-40-105.5. We agree with the parties that section 1-40-107 grants this court reviewing authority. Accordingly, we also address the standard that this court should use on review, and apply that standard here.

**1.**

¶16 The General Assembly recently revised the ballot initiative process to add a fiscal impact statement requirement. The new law, which took effect in March 2016, requires that "[f]or every initiated measure properly submitted to the title board under section 1-40-106, the [director of research of the legislative council of the general assembly] shall prepare an initial fiscal impact statement." § 1-40-105.5(2)(a). Among other things, the initial fiscal impact statement "must . . . [i]nclude an abstract," § 1-40-105.5(2)(c)(III), which must contain enumerated estimates and statements, § 1-40-105.5(3). The abstract included in the statement is final, "unless modified in accordance with section 1-40-107." § 1-40-105.5(2)(a).

¶17 Section 1-40-107 sets forth procedures for appealing the Title Board's actions.[5] Section 1-40-107(1)(a)(II) allows the "designated representatives of the [initiative's] proponents or any registered elector who is not satisfied with the abstract prepared . . .

---

[5] After this case was filed with this court, the Governor approved Senate Bill 17-152, set to take effect in August 2017, which adds an additional requirement to section 1-40-106 and amends section 1-40-107 accordingly. See S.B. 17-152, 71st Gen. Assemb., Reg. Sess. (Colo. 2017). The Bill does not concern abstracts, and it does not affect our analysis or holding in this case.

in accordance with section 1-40-105.5" to file a motion for a rehearing. A person may file a motion for rehearing on the grounds that the abstract includes an incorrect estimate, is misleading or prejudicial, or fails to meet the requirements listed in section 1-40-105.5(3). § 1-40-107(1)(a)(II). If a person files for rehearing, the Title Board "shall" hear the motion at the next scheduled meeting. § 1-40-107(1)(c). Any person who remains dissatisfied after the rehearing, who either presented the initiative or is a registered elector and filed a motion for rehearing or appeared before the Title Board, may then file a copy of the motion for rehearing—along with a "certified copy of the petition with . . . the abstract" and the ruling—"with the clerk of the supreme court." § 1-40-107(2). If a motion is filed with the clerk of the supreme court within seven days, section 1-40-107(2) provides that "the matter shall be disposed of promptly, consistent with the rights of the parties, either affirming the action of the title board or reversing it, in which latter case the court shall remand it with instructions, pointing out where the title board is in error."

¶18    In interpreting statutes, we look to the statutory language and give "words and phrases their plain and ordinary meanings." Doubleday v. People, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. The plain language of section 1-40-107 authorizes this court to review an abstract. Section 1-40-107(1)(a)(II) lists three grounds upon which a person dissatisfied with the Title Board's decision on an abstract may file a motion for rehearing, thereby establishing that abstracts are reviewable. Furthermore, section 1-40-107(2) explicitly permits those who filed a motion for rehearing with the Title Board "pursuant to subsection (1)" to file a copy of that motion "with the clerk of the

11

supreme court." Subsection 1 allows motions for rehearing to challenge a ballot title and submission clause and to challenge an abstract. See § 1-40-107(1)(a)(I)–(II). Finally, section 1-40-107(2) provides that if a motion for rehearing is timely filed with "the clerk of the supreme court," "the court shall" dispose of the matter promptly and either affirm or reverse the Title Board's actions. Because "the court" must refer to the only court mentioned in the section, "the supreme court," the plain language of section 1-40-107(2) authorizes this court to review the Title Board's final decision on an abstract.

¶19    Accordingly, we agree with the parties that this court has the authority to review an abstract prepared pursuant to section 1-40-105.5. We therefore turn to the proper standard of review and the abstract at issue here.

**2.**

¶20    Neither section 1-40-105.5, which sets out the new fiscal impact statement and abstract requirements, nor section 1-40-107 mandates this court to apply a particular standard of review to the Title Board's actions regarding an abstract. We therefore look to our case law on other actions by the Title Board for guidance. We conclude that the appropriate standard is the same standard we apply to the Title Board's single-subject and clear-title findings: we draw all legitimate presumptions in favor of the propriety of the Title Board's decision and only overturn the Board's decision in a clear case.

¶21    We see no reason to apply a different standard of review to the Title Board's approval of a fiscal impact statement abstract than we do to its setting of ballot titles and submission clauses. First, the grounds and procedures for challenging the setting of a title and for challenging an abstract are set forth in the same sections of the same

12

statute.  See § 1-40-107(1)–(2).  It thus follows that this court should use the same standard to review an abstract as is it does to review a title.  Furthermore, the General Assembly "is presumed to have knowledge of existing case law" at the time it acts.  Vigil v. Franklin, 103 P.3d 322, 330 (Colo. 2004).  Thus, we presume that when the General Assembly enacted the fiscal impact statement and abstract requirements, it was aware that this court employs "all legitimate presumptions in favor of the propriety" of the Title Board's decisions and only overturns the Board's decision "in a clear case," see In re 2013–2014 #90, ¶ 7, 328 P.3d at 158; In re 2011–2012 #3, ¶ 6, 274 P.3d at 565.  Because the General Assembly did not require a different standard in the new law, we presume that it intended for this court to apply the same deferential standard in reviewing challenges to abstracts as we do in reviewing challenges to other Title Board decisions.

¶22    The Title Board is also in a better position than this court to weigh the merits of evidence regarding the accuracy of an abstract.  The Title Board, unlike this court, holds public rehearings at which it may hear testimony, take evidence, and inquire into information presented by various sources.  Indeed, in this case, the Title Board heard testimony from a representative for the legislative council.  The director of research of the legislative council is the person tasked under section 1-40-105.5 with considering estimates submitted by interested parties and preparing the initial fiscal impact statement and abstract.  See § 1-40-105.5(1)–(2).  Thus, the Title Board is in a position to hear and consider information directly from the office that prepares abstracts.

Accordingly, we give great deference to the Title Board's decisions regarding abstracts, and we will not overturn its decision except in a clear case.

**3.**

¶23     Applying this standard here, we affirm the Title Board's decision approving the abstract for Initiative #4. The abstract states generally how local government revenue may be affected by the limitations on housing growth proposed in Initiative #4. For example, it notes that in communities with binding growth limits, Initiative #4 will reduce building permit revenue, but may increase property tax revenue if property values rise. Petitioners claim that, because the abstract does not include any hard numbers or other quantitative data, it is misleading and fails to satisfy the requirements for abstracts set forth in section 1-40-105.5(3). At the rehearing, however, the representative for the legislative council testified that it is simply not possible to provide quantitative estimates for the effects of Initiative #4. The representative explained that there is no way to predict which jurisdictions will exercise a new right to limit housing growth or choose to keep the one-percent growth limit past 2021, and therefore there is no way to give precise estimates of fiscal or other impacts. In such situations, the representative stated, it is standard practice for the council to provide indeterminate qualitative impact statements. Finally, the Title Board asked where section 1-40-105.5(3)'s requirements appear in the abstract. In response, an economist for the legislative council, who also testified, went through each requirement and the

14

council's attempt to comply, highlighting further the circumstances preventing accurate estimates.[6]

¶24 After considering the representative's and the economist's testimony, the Petitioners' claims, the requirements of section 1-40-105.5(3), and other available evidence, the Title Board decided to approve the abstract. We cannot say that this is a "clear case" where the Title Board's decision must be overturned. Accordingly, we affirm the Title Board's approval of the abstract.

## III.

¶25 For the above-stated reasons, we affirm the Title Board's actions.

---

[6] For example, regarding the required estimate of the effect the measure will have on state and local government revenues, expenditures, taxes, and fiscal liabilities, see § 1-40-105.5(3)(a), the economist stated that the council intended to communicate in the paragraph titled "Local government revenue and spending" that there would "be less revenue from building permits, and then expenditure impacts from less services provided." See Rehearing Tr. 68–69. The economist also testified that the phrase "[b]eginning in fiscal year 2018–19" in the same paragraph conveys ongoing expenditure and revenue impacts, and was meant to satisfy the requirement of an estimate of the amount of recurring state and local government expenditures or fiscal liabilities due to the measure, see § 1-40-105.5(3)(c). See Rehearing Tr. 70. And with respect to the required statement of the "economic benefits for all Coloradans," see § 1-40-105.5(3)(b), the economist said that, because economic impacts will depend on an individual's economic circumstances, the council could not say conclusively what the impacts would be "for all Coloradans" and thus attempted to meet the requirement by explaining in the paragraph titled "Economic impacts" that there will be impacts on jobs and population growth. See Rehearing Tr. 69.

## APPENDIX A—Initiative #4 and Titles

BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO:
ARTICLE XVIII OF THE CONSTITUTION OF THE STATE OF COLORADO IS
AMENDED BY THE ADDITION OF A NEW SECTION TO READ:

**Section 17. Colorado growth limitation**

(1) THE ELECTORS OF EVERY CITY, TOWN, CITY AND COUNTY, OR LOCAL
COUNTY, WHETHER STATUTORY OR HOME RULE, RESERVE THE RIGHT TO
LIMIT HOUSING GROWTH BY INITIATIVE AND REFERENDUM WITHOUT
LEGISLATIVE INHIBITION OR PENALTY. THIS RIGHT IS FURTHER RESERVED ON
A COUNTYWIDE BASIS WHEREBY ELECTORS THROUGHOUT A COUNTY MAY
ELECT TO LIMIT HOUSING GROWTH UNIFORMLY IN ALL LOCAL
GOVERNMENTS AND ANY PART OF SUCH, WHETHER STATUTORY OR HOME
RULE, WITHIN SUCH COUNTY BY INITIATIVE AND REFERENDUM.

(2) PRIVATELY OWNED RESIDENTIAL HOUSING GROWTH IN THE CITY AND
COUNTIES OF BROOMFIELD AND DENVER, AND COUNTYWIDE IN THE
COUNTIES OF ADAMS, ARAPAHOE, BOULDER, DOUGLAS, EL PASO, JEFFERSON,
LARIMER, AND WELD, INCLUDING ALL LOCAL GOVERNMENTS WITHIN SUCH
COUNTIES, SHALL NOT EXCEED ONE PERCENT ANNUALLY FOR THE YEARS
2019 AND 2020. IN SAID COUNTIES EACH LOCAL GOVERNMENT AND ANY
PART OF SUCH, WHETHER STATUTORY OR HOME RULE, AND EACH SAID CITY
AND COUNTY SHALL ALLOT BUILDING PERMITS SO THAT HOUSING GROWTH
DOES NOT EXCEED A ONE PERCENT ANNUAL GROWTH RATE IN THE TOTAL
NUMBER OF HOUSING UNITS IN EACH SAID YEAR. BEGINNING 2021 SUCH
GROWTH LIMITATIONS MAY BE AMENDED OR REPEALED BY INITIATIVE AND
REFERENDUM OR OTHERWISE SHALL REMAIN IN EFFECT.

(3) NO PERMITS TO BUILD NEW PRIVATELY OWNED RESIDENTIAL HOUSING
UNITS SHALL BE ISSUED WITHIN SAID COUNTIES INCLUDING ALL LOCAL
GOVERNMENTS CONTAINED WITHIN OR ANY PART OF SUCH AND SAID CITY
AND COUNTIES BEGINNING WITH THE DECLARATION OF VOTER APPROVAL
OF THIS SECTION UNTIL JANUARY 1, 2019.

(4) INITIATIVE AND REFERENDUM FOR THIS SECTION:
(a)  SIGNATURE REQUIREMENTS FOR INITIATIVE AND REFERENDUM FOR
ENACTING, REPEALING, OR AMENDING, PROPOSALS TO REGULATE THE
GROWTH OF PRIVATELY OWNED RESIDENTIAL HOUSING FOR LOCAL
GOVERNMENTS, WHETHER STATUTORY OR HOME RULE, SHALL BE FIVE
PERCENT OF THE TOTAL NUMBER OF VOTERS PARTICIPATING IN THE MOST
RECENT GENERAL ELECTION IN SUCH LOCAL GOVERNMENT. SUCH

PROPOSALS ON A COUNTYWIDE BASIS SHALL INCLUDE THE SUMMATION OF SUCH REQUIREMENT FROM EACH LOCAL GOVERNMENT AND ANY PART OF A LOCAL GOVERNMENT NOT GOVERNED WITHIN SUCH COUNTY ACCUMULATED FOR THE TOTAL SIGNATURE REQUIREMENT AS DETERMINED BY THE COUNTY CLERK.

(b) PETITIONS FOR COUNTYWIDE PROPOSALS SHALL BE ISSUED BY THE COUNTY CLERK FOR ALL LOCAL GOVERNMENTS OR ANY PART OF SUCH WITHIN SUCH COUNTY WITH STATED MINIMUM SIGNATURE REQUIREMENTS FOR EACH SUCH ENTITY.

(c) ONLY ONE CHALLENGE FOR THE FORM AND CONTENT OF A PETITION SHALL BE ALLOWED AND MUST BE FILED WITHIN TEN BUSINESS DAYS FOLLOWING APPROVAL BY THE CLERK OF A LOCAL GOVERNMENT OR BY THE COUNTY CLERK IN THE CASE OF COUNTYWIDE PETITIONS AND BEFORE SIGNATURE GATHERING COMMENCES. AN EXPEDITED JUDICIAL DECISION FOR SUCH A CHALLENGE SHALL BE FINAL.

(d) ONLY ONE CHALLENGE FOR SIGNATURE SUFFICIENCY SHALL BE ALLOWED AND MUST BE FILED WITHIN TEN BUSINESS OF THE CLERK'S CERTIFICATION OF SIGNATURE SUFFICIENCY AND AFTER ALLOWING FOR ADDITIONAL NEEDED SIGNATURES. RECERTIFICATION SHALL NOT EXCEED TWO WEEKS AND SHALL BE FINAL.

(5) IF ANY PROVISION OF THIS SECTION IS HELD INVALID, THE REMAINDER OF THIS SECTION SHALL REMAIN UNIMPAIRED.

(6) AS USED IN THIS SECTION, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(a) "ANNUAL GROWTH" MEANS THAT WHICH OCCURS IN A PARTICULAR CALENDAR YEAR MEASURED IN THE TOTAL NUMBER Of HOUSING UNITS ABOVE THAT FOR THE PREVIOUS YEAR.

(b) "HOUSING UNIT" MEANS A BUILDING OR ANY PORTION OF A BUILDING DESIGNED FOR OCCUPANCY AS COMPLETE, INDEPENDENT LIVING QUARTERS FOR ONE OR MORE PERSONS, HAVING DIRECT ACCESS FROM THE OUTSIDE OF THE BUILDING OR THROUGH A COMMON HALL AND HAVING LIVING, SLEEPING, KITCHEN, AND SANITARY FACILITIES FOR THE EXCLUSIVE USE OF THE OCCUPANTS. A DETACHED HOME HAS ONE HOUSING UNIT WHEREAS AN APARTMENT BUILDING WITH EIGHTY APARTMENTS HAS EIGHTY HOUSING UNITS.

(c) "LOCAL COUNTY" MEANS THE COUNTY, WHETHER STATUTORY OR HOME RULE, AS A SEPARATE LOCAL GOVERNMENT WITHIN SUCH COUNTY AS IN THE UNINCORPORATED COUNTY.

(d) "LOCAL GOVERNMENT" MEANS A CITY, TOWN, CITY AND COUNTY, OR LOCAL COUNTY, WHETHER STATUTORY OR HOME RULE.

(e) "PRIVATELY OWNED RESIDENTIAL HOUSING" MEANS A SUMMATION OF HOUSING UNITS WHICH ARE RESIDENTIALLY ZONED OR OTHERWISE

INTENDED FOR PRIVATE RESIDENTIAL USE. THOSE OWNED BY A FEDERAL, STATE OR LOCAL GOVERNMENT ENTITY, OR AN EDUCATIONAL, MEDICAL, OR PENAL FACILITY ARE EXCLUDED AS ARE COMMERCIALLY ZONED ACCOMMODATIONS SUCH AS HOTELS AND MOTELS.

**Proposed Initiative 2017–2018 #4[1]**

The title as designated and fixed by the Board is as follows:

An amendment to the Colorado constitution concerning limitations on the growth of housing, and, in connection therewith, permitting the electors of every city, town, city and county, or county to limit housing growth by initiative and referendum; permitting county voters by initiative and referendum to limit housing growth uniformly within the county, including all or parts of local governments within the county; establishing procedural requirements for initiatives for local governments, whether statutory or home rule, concerning limits on housing growth; and for the city and counties of Broomfield and Denver, and in the counties of Adams, Arapahoe, Boulder, Douglas, El Paso, Jefferson, Larimer, and Weld: 1) prohibiting the issuance of new permits for privately owned housing units by local governments located in whole or in part within such counties and such cities and counties until January 1, 2019, 2) limiting the growth of privately owned residential housing units to one percent annually starting in 2019, and 3) permitting the one percent growth limitation to be amended or repealed by initiative and referendum commencing in 2021.

The ballot title and submission clause as designated and fixed by the Board is as follows:

Shall there be an amendment to the Colorado constitution concerning limitations on the growth of housing, and, in connection therewith, permitting the electors of every city, town, city and county, or county to limit housing growth by initiative and referendum; permitting county voters by initiative and referendum to limit housing growth uniformly within the county, including all or parts of local governments within the county; establishing procedural requirements for initiatives for local governments, whether statutory or home rule, concerning limits on housing growth; and for the city and counties of Broomfield and Denver, and in the counties of Adams, Arapahoe, Boulder, Douglas, El Paso, Jefferson, Larimer, and Weld: 1) prohibiting the issuance of new permits for privately owned housing units by local governments located in whole or in part within such counties and such cities and counties until January 1, 2019, 2) limiting the growth of privately owned residential housing units to one percent annually starting in 2019, and 3) permitting the one percent growth limitation to be amended or repealed by initiative and referendum commencing in 2021?

---

[1] Unofficially captioned **"Limit on Local Housing Growth"** by legislative staff for tracking purposes. This caption is not part of the titles set by the Board.

# APPENDIX B — Abstract of Initiative #4

## Abstract of Initiative 4: Limit on Local Housing Growth

**An initial fiscal estimate, prepared by the nonpartisan Director of Research of the Legislative Council as of December 2016, identifies the following impacts:**

The abstract includes estimates of the fiscal impact of the proposed initiative. If this initiative is to be placed on the ballot, Legislative Council Staff will prepare new estimates as part of a fiscal impact statement, which includes an abstract of that information. All fiscal impact statements are available at www.ColoradoBlueBook.com and the abstract will be included in the ballot information booklet that is prepared for the initiative.

*Local government revenue and spending*. Beginning in FY 2018-19, the proposed initiative will reduce local government revenue from building permits, property tax revenue on new construction, and use taxes in districts with a binding housing growth limit. To the extent that property values increase because of the measure, local governments may receive additional property tax revenue. In addition, local government spending will be reduced because there will be less demand for services provided to new homes and residents such as roads, utilities, and fire and police protection.

*Economic impacts*. The value of existing housing units may increase in communities where there are binding growth limits, impacting homeowners and landlords. For Colorado residents that would like to move into communities with binding housing limits, this measure may make it more expensive to find homes to buy or rent. Limits on housing permits will also impact the distribution of construction employment, retail trade, and population within Colorado.