Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2020 CO 61**

**No. 20SA154,** *In re Title, Ballot Title & Submission Clause for 2019–2020 #315 —*
**Clear Title Requirement — Single Subject Requirement — Ballot Titles.**

In this opinion, the supreme court reviews the actions of the Title Board in

setting the title and the ballot title and submission clause for Initiative 2019–2020

#315 ("Initiative #315"). Initiative #315 proposes to add section 22 to article X of

the Colorado Constitution and to amend certain statutory provisions in Titles 24

and 39 of the Colorado Revised Statutes in order to create a new preschool

program. This program would be created by reallocating revenue generated by

existing state taxes on tobacco products and tobacco litigation settlements and by

levying a new sales tax on tobacco-derived nicotine vapor products.

The court concludes that the title that the Title Board set for Initiative #315

presents a single subject, namely, the creation and administration of a Colorado

preschool program funded by state taxes on nicotine and tobacco products. It

further concludes that the title satisfies the clear title requirement because it

describes Initiative #315's central features succinctly, accurately, and fairly and in

a manner that will not mislead voters.  Accordingly, the court affirms the Title

Board's actions in setting the title for Initiative #315.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

---

**2020 CO 61**

---

**Supreme Court Case No. 20SA154**
*Original Proceeding Pursuant to § 1-40-107(2), C.R.S. (2019)*
Appeal from the Ballot Title Setting Board

---

In the Matter of the Title, Ballot Title and Submission Clause for 2019-2020 #315

**Petitioner:**

Anna Jo Haynes,

v.

**Respondents:**

Monica Vondruska and Jon Caldara,

**Title Board:**

Theresa Conley, David Powell, and Jason Gelender.

---

**Title Board Action Affirmed**
*en banc*
June 22, 2020

---

**Attorneys for Petitioner:**
Recht Kornfeld, P.C.
Mark G. Grueskin
 *Denver, Colorado*

**Attorneys for Respondents:**
Ireland Stapleton Pryor & Pascoe, PC
Benjamin J. Larson
William A. Hobbs
*Denver, Colorado*

**Attorneys for Title Board:**
Philip J. Weiser, Attorney General
Grant T. Sullivan, Assistant Solicitor General
*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE HART** dissents, and **JUSTICE HOOD** joins in the dissent.

¶1 In this opinion, we review the actions of the Title Board in setting the title and the ballot title and submission clause for Initiative 2019–2020 #315 ("Initiative #315"). Initiative #315 proposes to add section 22 to article X of the Colorado Constitution and to amend certain statutory provisions in Titles 24 and 39 of the Colorado Revised Statutes in order to create a new preschool program. This program would be created by reallocating revenue generated by existing state taxes on tobacco products and tobacco litigation settlements and by levying a new sales tax on tobacco-derived nicotine vapor products.[1]

¶2 We conclude that the title that the Title Board set for Initiative #315 presents a single subject, namely, the creation and administration of a Colorado preschool program funded by state taxes on nicotine and tobacco products. We further conclude that the title satisfies the clear title requirement because it describes Initiative #315's central features succinctly, accurately, and fairly and in a manner that will not mislead voters. Accordingly, we affirm the Title Board's actions in setting the title for Initiative #315.

---

[1] The text, title, and ballot title and submission clause for Initiative #315 are attached as an appendix to this opinion.

3

# I. Facts and Procedural Background

¶3    Pursuant to section 1-40-106, C.R.S. (2019), proponents-respondents Monica Vondruska and Jon Caldara submitted proposed Initiative #315 to the Title Board for the setting of a title and submission clause. The Board conducted an initial public hearing and, concluding that Initiative #315 contained a single subject, proceeded to set the following title:

> Shall state taxes be increased $6,300,000 annually by an amendment to the Colorado Constitution and a change to the Colorado Revised Statutes concerning a new preschool program that is funded with revenue generated by state taxes on tobacco and nicotine products, and, in connection therewith, requiring the state to create and administer the new preschool program, which must supplement existing preschool programs and funding, and paying for the program by: 1) imposing a new tax on tobacco-derived nicotine vapor products; and 2) reallocating from certain health-related programs and other state purposes portions of the existing revenue from taxes on tobacco and nicotine products and money the state receives from tobacco litigation settlements?

¶4    Petitioner Anna Jo Haynes then filed a motion for rehearing, asserting that the title did not satisfy either the single subject or clear title requirement. The Board conducted a rehearing and denied petitioner's motion for rehearing in its entirety.

¶5    Petitioner now petitions for review pursuant to section 1-40-107(2), C.R.S. (2019).

4

## II. Standard of Review

¶6 "The Title Board is vested with considerable discretion in setting the title and the ballot title and submission clause," and we will reverse the Board's decision only when a title is insufficient, unfair, or misleading. *In re Title, Ballot Title & Submission Clause for 2013–2014 #90*, 2014 CO 63, ¶ 8, 328 P.3d 155, 159.

¶7 In reviewing Title Board title settings, "we employ all legitimate presumptions in favor of the propriety of the Board's actions." *In re Title, Ballot Title & Submission Clause for 2009–2010 #45*, 234 P.3d 642, 645 (Colo. 2010).

¶8 In addition, in our limited review of the Title Board's actions, we do not address the merits of the proposed initiative. *In re 2013–2014 #90*, ¶ 9, 328 P.3d at 159. Nor do we suggest how it might be applied if enacted. *Id.* Rather, as pertinent here, we must examine the initiative's wording to determine whether it comports with the constitutional requirements. *See id.* In conducting this limited inquiry, we employ the general rules of statutory construction, giving words and phrases their plain and ordinary meanings. *Id.*

## III. Analysis

¶9 Petitioner contends that Initiative #315 violates both the Colorado Constitution's single subject and clear title requirements for ballot titles. We address these arguments in turn.

5

## A. Single Subject Requirement

¶10 Article V, section 1(5.5) of the Colorado Constitution provides, in pertinent part:

> No measure shall be proposed by petition containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any measure which shall not be expressed in the title, such measure shall be void only as to so much thereof as shall not be so expressed. If a measure contains more than one subject, such that a ballot title cannot be fixed that clearly expresses a single subject, no title shall be set and the measure shall not be submitted to the people for adoption or rejection at the polls.

*See also* § 1-40-106.5(1)(a), C.R.S. (2019) ("Section 1(5.5) of article V . . . require[s] that every constitutional amendment or law proposed by initiative . . . be limited to a single subject, which shall be clearly expressed in its title[.]").

¶11 The single subject requirement serves two functions.

¶12 First, it is intended

> [t]o forbid the treatment of incongruous subjects in the same measure, especially the practice of putting together in one measure subjects having no necessary or proper connection, for the purpose of enlisting in support of the measure the advocates of each measure, and thus securing the enactment of measures that could not be carried upon their merits[.]

§ 1-40-106.5(1)(e)(I).

¶13 Accordingly, "an initiative's subject matter must be necessarily and properly connected rather than disconnected or incongruous, and the initiative will be held to violate the single subject requirement when it relates to more than

6

one subject and has at least two distinct and separate purposes." *In re Title, Ballot Title & Submission Clause for 2015–2016 #73*, 2016 CO 24, ¶ 14, 369 P.3d 565, 568. Such a requirement "prevents the proponents from combining multiple subjects to attract a 'yes' vote from voters who might vote 'no' on one or more of the subjects if they were proposed separately." *In re Title, Ballot Title & Submission Clause for 2013–2014 #76*, 2014 CO 52, ¶ 8, 333 P.3d 76, 79.

¶14 Second, the single subject requirement seeks "[t]o prevent surreptitious measures and apprise the people of the subject of each measure by the title, that is, to prevent surprise and fraud from being practiced upon voters." § 1-40-106.5(1)(e)(II).

¶15 When an initiative tends to effectuate one general objective or purpose, then the initiative presents only one subject. *In re 2015–2016 #73*, ¶ 17, 369 P.3d at 568. Accordingly, an initiative will not be deemed to violate the single subject requirement merely because it spells out details relating to its implementation. *In re Title, Ballot Title & Submission Clause & Summary for 1997–1998 No. 74*, 962 P.2d 927, 929 (Colo. 1998). Nor will an initiative be deemed to violate the single subject requirement because it may have different effects on other provisions of Colorado law. *In re 2013–2014 #90*, ¶ 17, 328 P.3d at 160. Such effects are not relevant to whether the proposed initiative contains a single subject. *Id.*

¶16 The breadth of the initiative's objective, however, is not without limits. For example, "[a] proponent's attempt to characterize an initiative under some general theme will not save the initiative from violating the single-subject rule if the initiative contains multiple subjects." *In re Title, Ballot Title & Submission Clause for 2009–2010 #91*, 235 P.3d 1071, 1076 (Colo. 2010).

¶17 We liberally construe the single subject requirement both because of the Title Board's considerable discretion in setting the title and the ballot title and submission clause and in order to avoid unduly restricting the initiative process. *In re 2013–2014 #90*, ¶ 12, 328 P.3d at 159–60. We will therefore overturn the Board's finding that an initiative contains a single subject only in a "clear case." *In re 2013–2014 #76*, ¶ 8, 333 P.3d at 79.

¶18 Here, petitioner contends that the title set by the Board for Initiative #315 violates the Colorado Constitution's single subject requirement because it both expands preschool programs and penalizes local policy makers who ban any form of tobacco or nicotine products. Specifically, petitioner argues that the title improperly forces voters to choose between enhanced preschool programming, which the voters may be inclined to support, and forsaking legislative prerogatives that could be used in pursuit of other policy goals. Petitioner further asserts that the "financial penalties" that would result were a local legislature to ban tobacco and nicotine products would not be apparent to voters who thought

8

that they were voting to fund a preschool program. We are not persuaded by any of these arguments.

¶19 Initiative #315 raises $6.3 million through a new sales tax on vaping products. The measure further reallocates certain existing state cigarette and tobacco tax revenue from local governments that ban sales of tobacco and nicotine products to the preschool program that Initiative #315 creates. And the measure reallocates a portion of the cigarette and tax revenue generated by article X, section 21 of the Colorado Constitution that currently funds tobacco education, health, and cessation programs, redirecting a portion of these tax funds to the new preschool program.

¶20 In our view, the foregoing provisions are all implementing provisions that are necessarily and properly related to Initiative #315's single subject of creating and administering a Colorado preschool program funded by state taxes on nicotine and tobacco products. Moreover, notwithstanding petitioner's assertion to the contrary, the title sufficiently alerts voters that existing state cigarette and tobacco tax revenue will be reallocated from current programs to the new preschool program. And we do not agree with petitioner's contention that voters will be surprised to learn that localities that choose to ban the sales of tobacco and nicotine products will lose tax revenue derived from the sales of such products. To the contrary, we expect, as one of the Title Board members observed, that a

9

knowledgeable voter would understand that prohibiting the sale of tobacco and nicotine products in his or her locality would result in a loss of tax revenue derived from the sales of such products.

¶21 We are not persuaded otherwise by petitioner's characterization of the reallocation of tax revenues away from localities that ban the sale of tobacco and nicotine products as a "financial penalty." Labeling the reallocation as such does not alter the fact that this reallocation is one means of implementing Initiative #315's single subject of creating a preschool program by redirecting tax revenues to that program. Nor has petitioner argued (and the record before us does not reflect) that this reallocation provision was a surreptitious effort to protect the vaping industry.

¶22 We likewise are unpersuaded by petitioner's reliance on *In re 2009–2010 #91*, 235 P.3d at 1073–79. In that case, the measure at issue sought to levy a beverage container tax "to protect and preserve the waters of the state." *Id.* at 1073. In accordance with that purpose, the tax revenues to be collected were to be distributed to Colorado's nine basin roundtables and the interbasin compact committee for, among other things, protecting, administering, and developing renewable surface waters and groundwater supplies for maximum utilization. *Id.* at 1073–74. In addition to the foregoing, however, the measure would have placed a four-year moratorium on legislative action by the General Assembly, precluding

it from amending, repealing, or modifying the initiative's provisions governing the basin roundtables and interbasin compact committee. *Id.* at 1075. We concluded that this four-year moratorium was a separate subject that was not necessarily and properly connected to the initiative's subject of establishing and administering a beverage container tax. *Id.* at 1078–80. Moreover, we opined that voters would have been surprised to learn that the initiative, if adopted, would have prohibited the voters' elected representatives "from exercising any authority over the basin roundtables and the interbasin compact committee for a substantial period of time, at least equal to the four-year term of senators they elect." *Id.* at 1079.

¶23    Here, in contrast, Initiative #315 imposes no moratorium on local legislative action. If Initiative #315 passes, local legislatures will remain free to choose to ban tobacco and nicotine products or not. If they choose to do so, however, then a consequence of that action would be a redirection of the locality's state cigarette and tax revenue to the new preschool program. Such a consequence, however, does not render this reallocation provision a separate subject. *See In re 2013–2014 #90*, ¶ 17, 328 P.3d at 160. Moreover, for the reasons set forth above, the reallocation would be necessarily and properly connected to Initiative #315's single subject of establishing and administering a new preschool program.

11

¶24    For these reasons, we conclude that Initiative #315 comprises a single subject, and we proceed to address petitioner's assertion that the title set by the Board violates our constitution's clear title requirement.

## B. Clear Title Requirement

¶25    An initiative's single subject must be clearly expressed in its title. Colo. Const. art. V, § 1(5.5); *In re 2015–2016 #73*, ¶ 22, 369 P.3d at 568. "The title and submission clause should enable the electorate, whether familiar or unfamiliar with the subject matter of a particular proposal, to determine intelligently whether to support or oppose such a proposal." *In re 2013–2014 #90*, ¶ 23, 328 P.3d at 162. When setting a title, the Title Board "shall consider the public confusion that might be caused by misleading titles and shall, whenever practicable, avoid titles for which the general understanding of the effect of a 'yes/for' or 'no/against' vote will be unclear." § 1-40-106(3)(b). In addition, the title "shall correctly and fairly express the true intent and meaning" of the initiative. *Id.* And the title "shall be brief." *Id.*

¶26    The Title Board is given discretion in resolving interrelated problems of length, complexity, and clarity in designating a title and ballot title and submission clause. *In re 2015–2016 #73*, ¶ 23, 369 P.3d at 569. The Board is required to summarize the central features of a proposed initiative fairly, but it "need not explain the meaning or potential effects of the proposed initiative on the current

12

statutory scheme." *Id.*; *see also In re Title, Ballot Title & Submission Clause & Summary for Petition on Campaign & Political Fin.*, 877 P.2d 311, 315 (Colo. 1994) (noting that the Board need only "fairly summarize the central points of a proposed measure"). Nor must a title recite every detail of the proposed measure. *In re Title, Ballot Title & Submission Clause for Proposed Initiatives 2001–2002 #21 & #22*, 44 P.3d 213, 222 (Colo. 2002). Instead, the Board must "navigate the straits between brevity and unambiguously stating the central features of the provision sought to be added, amended, or repealed." *In re Title, Ballot Title & Submission Clause & Summary for Proposed Initiative Concerning Auto. Ins. Coverage*, 877 P.2d 853, 857 (Colo. 1994).

¶27 In deciding whether a title complies with the constitution's clear title requirement, "we do not consider whether the Title Board set the best possible title." *In re 2015–2016 #73*, ¶ 24, 369 P.3d at 569. Instead, we need only "ensure that the title fairly reflects the proposed initiative such that voters will not be misled into supporting or opposing the initiative because of the words employed by the Title Board." *Id.* We will generally defer to the Board's choice of language unless the titles set "contain a material and significant omission, misstatement, or misrepresentation." *In re Title, Ballot Title & Submission Clause & Summary for 1997–98 #62*, 961 P.2d 1077, 1082 (Colo. 1998). And again, we will only overturn

13

the Board's action in a clear case. *In re Title, Ballot Title & Submission Clause & Summary Pertaining to Casino Gaming Initiative*, 649 P.2d 303, 306 (Colo. 1982).

¶28 Here, petitioner contends that the title set by the Title Board for Initiative #315 violates the Colorado Constitution's clear title requirement because the title (1) erroneously informs voters that the new nicotine vapor tax is set, in whole or in part, "by an amendment to the Colorado Constitution"; (2) does not inform voters about the purported penalty created for local jurisdictions that ban the sale of any tobacco or nicotine product; and (3) does not advise voters regarding major cuts to programs from existing funds. We address and reject each of these contentions in turn.

¶29 With respect to petitioner's contention that the title erroneously informs voters that the new nicotine vapor tax is set, in whole or part, in the constitution, petitioner asserts that the wording of the title communicates one of two possible constructions: (1) the new tax created by Initiative #315 is created in the constitution, and the preschool program is created in the Colorado Revised Statutes; or (2) the new tax is created in both the constitution and Colorado statutory law. Petitioner contends that both of these constructions are incorrect because the tax, in fact, is created by statute alone. She further notes that the Board could have adopted alternative wording that would have clarified this issue (e.g.,

14

wording that would have mentioned the statutory amendments before the constitutional ones), but the Board did not do so.

¶30 As an initial matter, we note that petitioner has set up a false choice because she has omitted a third, and we believe, more logical construction, namely, that the title makes clear that the tax increase is part of the overall measure. In our view, such a drafting decision properly reflects the fact that the constitutional and statutory amendments proposed by Initiative #315 work in tandem to create and administer the new preschool program, and this drafting determination by the Board in no way renders the title inaccurate or misleading. Moreover, we agree with the proponents and the Board that where the tax is created is not a central feature of this initiative. As they observe, voters are interested in the fact that the measure would impose a new tax, and petitioner has offered no evidence to suggest that voters will be influenced by where the tax is created. Last, we perceive no basis for overriding the Board's discretionary decision to mention first in the title the fact that the initiative proposes an amendment to the constitution. To the contrary, the Board's determination that voters might view as especially significant the fact that this initiative would amend our constitution is well within the Board's drafting discretion.

¶31 With respect to petitioner's assertion that the title does not inform voters about the purported penalty created for local jurisdictions that ban the sale of

15

tobacco or nicotine products, as noted above, we do not agree with petitioner's premise that the provision redirecting state tax revenues from jurisdictions that ban the sale of tobacco and nicotine products to the new preschool program is a "penalty." To the contrary, that provision is simply one of several means set forth in the measure for reallocating and redirecting existing and future state cigarette and tobacco tax revenues to the new preschool program that Initiative #315 creates. In any event, as set forth above, the Board is not required to set forth in the title all of the details of each funding mechanism set forth in the measure. *See In re 2001–2002 #21 & #22*, 44 P.3d at 222. To the contrary, the Board must balance the requirement of brevity against the requirement that the title unambiguously set forth the measure's central features. *See In re Proposed Initiative Concerning Auto. Ins. Coverage*, 877 P.2d at 857. Indeed, requiring the Board to include all of the details that petitioner claims should have been included would result in a lengthy and complex title, and this would be contrary to the Board's statutory charge. *See* § 1-40-106(3)(b).

¶32 Finally, as to petitioner's contention that the title at issue does not advise voters regarding major cuts to programs from existing funds, we disagree that the Board was required to itemize in the title some or all of the programs that would face funding cuts. Again, requiring that level of detail in the title would render the title unnecessarily long and potentially confusing, contrary to the

above-described statutory mandate. And to the extent that petitioner asserts that the Board should at least have identified in the title the "key programs" that would be subject to such reallocations, petitioner does not define the word "key," nor does she indicate how the Board was to determine which programs would fit such a definition. Accordingly, we conclude that it was sufficient for the Board to summarize generally the category of programs from which funds would be reallocated (i.e., "certain health-related programs"), as it did.

¶33 For all of these reasons, we conclude that the title set for Initiative #315 satisfies our constitution's clear title requirement.

## IV. Conclusion

¶34 Because (1) Initiative #315 effectuates one general objective or purpose, does not treat incongruous subjects in the same measure, comprises subject matter that is necessarily and properly connected, contains nothing surreptitious or hidden, and presents no risk of surprise or fraud on voters and (2) the title set by the Title Board clearly, succinctly, and accurately describes Initiative #315's central features in a manner easily understandable to voters, we conclude that the Board has satisfied both the single subject and clear title requirements of the Colorado Constitution.

¶35 Accordingly, we affirm the Board's actions in setting the title for Initiative #315.

17

**JUSTICE HART** dissents, and **JUSTICE HOOD** joins in the dissent.

# APPENDIX – Initiative # 315 and Titles

*Be it enacted by the People of the State of Colorado:*

**SECTION 1**. In the Constitution of the State of Colorado **add** section 22 to article X as follows:

SECTION 22. REVENUES FROM EXISTING TOBACCO TAXES TO FUND A COLORADO PRESCHOOL PROGRAM. (1) THE PEOPLE OF THE STATE OF COLORADO FIND AND DECLARE THAT SINCE 2005 THERE HAVE BEEN SIGNIFICANT IMPROVEMENTS IN THE REGULATION OF THE SALE AND USE OF CIGARETTES AND TOBACCO PRODUCTS WITH THE ADOPTION OF COMPREHENSIVE SMOKE-FREE POLICIES BY STATE AND LOCAL GOVERNMENTS, THE PASSAGE OF THE FEDERAL "FAMILY SMOKING PREVENTION AND TOBACCO CONTROL ACT" IN 2009 AND ADOPTION OF 2019 AMENDMENTS TO THE FEDERAL "FOOD, DRUG AND COSMETIC ACT" TO RAISE THE MINIMUM AGE OF THE SALE OF TOBACCO AND NICOTINE PRODUCTS FROM 18 YEARS OF AGE TO 21 YEARS OF AGE.

(2) THE PEOPLE FIND AND DECLARE THAT THE UNITED STATES SURGEON GENERAL HAS STATED THAT TOBACCO SMOKING IN THE UNITED STATES IS NOW AT AN ALL-TIME LOW. THE COLORADO TOBACCO EDUCATION, PREVENTION, AND CESSATION GRANT PROGRAM REVIEW COMMITTEE HAS MADE SIMILAR FINDINGS OF REDUCED TOBACCO USAGE BY COLORADANS.

(3) FINALLY, THE PEOPLE OF THE STATE OF COLORADO FIND AND DECLARE THAT EXISTING REVENUES FROM THE CIGARETTE AND TOBACCO TAXES IMPOSED BY SECTION 21 OF THIS ARTICLE X IN 2005 SHOULD BE REDISTRIBUTED TO CONTINUE TO FUND TOBACCO EDUCATION, CESSATION AND PREVENTION PROGRAMS WHERE NEEDED AND TO CONTINUE TO FUND HEALTH EDUCATION, RESEARCH AND TREATMENT PROGRAMS, BUT TO ALSO FUND A NEW PRESCHOOL PROGRAM FOR THE CHILDREN OF COLORADO AS SET FORTH HEREIN WITH NO NEW TAXES.

(4) NOTWITHSTANDING ANY OTHER PROVISION OF LAW, THE GENERAL ASSEMBLY SHALL ENACT AUTHORIZING LEGISLATION NO LATER THAN DECEMBER 31, 2021, TO ENABLE THE DEPARTMENT OF EDUCATION, OR SUCH OTHER DEPARTMENT OR DELEGATED ENTITY THAT IS DETERMINED BY THE GENERAL ASSEMBLY TO BE BEST QUALIFIED, TO CREATE AND ADMINISTER, USING EXISTING REVENUES, A NEW COLORADO PRESCHOOL PROGRAM IN A MANNER THAT FOSTERS THE PROGRAM'S ADMINISTRATION, CONSISTENT WITH VOTER INTENT. THE LEGISLATION SHALL CREATE THE PRESCHOOL CASH FUND IN THE STATE TREASURY. EVERY YEAR, BEGINNING WITH THE 2021-2022 FISCAL YEAR, THE SUM OF ONE HUNDRED MILLION DOLLARS FROM

EXISTING TAX REVENUES COLLECTED PURSUANT TO SECTION 21, ARTICLE X MUST BE CREDITED TO THE PRESCHOOL CASH FUND, EXCEPT THAT THE PERCENTAGE OF SIXTEEN PERCENT OF REVENUES SHALL REMAIN APPROPRIATED FOR SCHOOL AND COMMUNITY BASED AND STATEWIDE TOBACCO PROGRAMS DESIGNED TO REDUCE INITIATION OF TOBACCO USE BY CHILDREN, PROMOTE CESSATION OF TOBACCO USE AMONG YOUTH AND ADULTS AND REDUCE EXPOSURE TO SECOND HAND SMOKE. SUCH REVENUES SHALL CONTINUE TO BE APPROPRIATED THROUGH THE "TOBACCO EDUCATION, PREVENTION AND CESSATION ACT" PART 8 OF ARTICLE 3.5 OF TITLE 25, COLORADO REVISED STATUTES, AND ANY SUCCESSOR ACT. NO LATER THAN DECEMBER 31, 2021, THE GENERAL ASSEMBLY SHALL ENACT LEGISLATION TO REALLOCATE THE PERCENTAGES SET FORTH IN SECTION 21 OF THIS ARTICLE X FOR THE PURPOSES SET FORTH THEREIN AND IN THIS SECTION 22. THE PRESCHOOL CASH FUND SHALL BE SUBJECT TO ANNUAL APPROPRIATION BY THE GENERAL ASSEMBLY SOLELY FOR THE DIRECT AND INDIRECT COSTS OF THE NEW COLORADO PRESCHOOL PROGRAM. THE NEW COLORADO PRESCHOOL PROGRAM AND ITS FUNDING AS PROVIDED BY THIS SUBSECTION (4) MUST SUPPLEMENT AND NOT SUPPLANT ANY EXISTING PROGRAMS AND FUNDING RELATING TO PRESCHOOL EDUCATION.

(5) ANY AUTHORIZING LEGISLATION FOR THE PRESCHOOL PROGRAM SHALL INCLUDE A MANDATE THAT, TO THE EXTENT PRACTICABLE, THE FUNDS BE USED TO FOSTER:

(I) PROGRAMMATIC ADMINISTRATION THAT ALLOWS FOR PARENT CHOICE, ENSURES SCHOOL-BASED AND COMMUNITY-BASED PROGRAMS THAT MEET QUALITY AND PROGRAM STANDARDS, PRIORITIZES COMMUNITY NEEDS IN A MANNER THAT WILL SUPPORT AND STRENGTHEN THE DIVERSITY OF BIRTH TO KINDERGARTEN SERVICE PROVIDERS, AND HELPS TO ACHIEVE STATE AND LOCAL MIXED DELIVERY GOALS;

(II) HIGH-QUALITY PROGRAMMING THAT HELPS PREPARE CHILDREN FOR KINDERGARTEN;

(III) COORDINATION WITH EXISTING EARLY CHILDHOOD SYSTEMS AND INITIATIVES AND ADVANCING ALIGNMENT WITH KINDERGARTEN THROUGH TWELFTH GRADE SYSTEMS TO SUPPORT CHILDREN'S TRANSITIONS TO SCHOOL;

(IV) OPPORTUNITIES FOR EVIDENCE-BASED PARENT, FAMILY, AND COMMUNITY ENGAGEMENT; AND

(V) AN EVALUATION OF EARLY CHILDHOOD EDUCATION PROGRAM EFFECTIVENESS, INCLUDING THE IMPACT OF PRESCHOOL ON CHILD AND FAMILY OUTCOMES.

**SECTION 2.** In Colorado Revised Statutes, **amend** subsection (1.7) of section 24-75-1104.5 as follows:

(1.7) NOTWITHSTANDING ANY OTHER PROVISION OF LAW, THE PEOPLE OF THE STATE OF COLORADO FIND AND DECLARE THAT, FOR FISCAL YEARS BEGINNING ON OR AFTER JULY 1, 2022, THE SETTLEMENT MONEYS RECEIVED BY THE STATE IN THE PRECEDING FISCAL YEAR SHALL BE ALLOCATED AS FOLLOWS. Except as otherwise provided in subsections (1.3) and (5) of this section, and except that disputed payments received by the state in the 2015-16 fiscal year or in any year thereafter are excluded from the calculation of allocations under this subsection (1.7), for the 2016-17 fiscal year and for each fiscal year thereafter, the following programs, services, and funds shall receive the following specified percentages of the total amount of settlement moneys received by the state in the preceding fiscal year:

(a) The Colorado nurse home visitor program created in article 6.4 of title 26, C.R.S., shall receive twenty-six and seven-tenths percent of the settlement moneys;

(b)(a)  The children's basic health plan trust created in section 25.5-8-105, C.R.S., shall receive eighteen percent of the settlement moneys;

(c)(b) The University of Colorado Health Sciences Center shall receive a base amount of fifteen and one-half percent of the settlement moneys and an additional amount of two percent of the settlement moneys, and the state treasurer shall credit both THE amounts to the tobacco litigation settlement moneys health education fund, which is hereby created in the state treasury. The state treasurer shall credit all interest and income derived from the deposit and investment of money in the fund to the fund. Any unexpended and unencumbered money in the fund at the end of any fiscal year remains in the fund and shall not be credited or transferred to the general fund or any other fund. All money in the fund is subject to annual appropriation by the general assembly to the health sciences center, but the health sciences center shall use the additional amount of settlement moneys credited to the fund only for tobacco-related in-state cancer research as authorized in section 24-75-1103 (7).

(d) The Fitzsimons trust fund created in section 23-20-136 (3), C.R.S., shall receive eight percent of the settlement moneys. Subject to annual appropriation by the general assembly, the settlement moneys shall be used as specified in section 23-20-136 (5), C.R.S.

(e) The Tony Grampsas youth services program created in article 6.8 of title 26, C.R.S., shall receive seven and one-half percent of the total amount of settlement moneys, which the state treasurer shall transfer to the youth services program fund created in section 26-6.8-102 (2) (d), C.R.S.;

(f) The drug assistance program created in section 25-4-1401, C.R.S., shall receive five percent of the settlement moneys;

(g) The AIDS and HIV prevention fund created in section 25-4-1405, C.R.S., shall receive three and one-half percent of the settlement moneys;

(h) The supplemental tobacco litigation settlement moneys account of the Colorado immunization fund created in section 25-4-2301, C.R.S., shall receive two and one- half percent of the settlement moneys;

(i)(c) The tobacco settlement defense account of the tobacco litigation settlement cash fund created in section 24-22-115 (2) (a) shall receive two and one-half percent of the settlement moneys;

(j) The supplemental state contribution fund created in section 24-50-609 (5) shall receive two and three-tenths percent of the settlement moneys, which, subject to annual appropriation by the general assembly, shall be used to pay the costs of increased nonsupplemental state contributions and to provide supplements to the state contribution for state employee group benefit plans for each eligible state employee as required by section 24-50-609.5;

(k) The Colorado autism treatment fund created pursuant to section 25.5-6-805, C.R.S., shall receive two percent of the settlement moneys to pay a portion of the state's share of the annual funding required by the "Home- and Community-based Services for Children with Autism Act", part 8 of article 6 of title 25.5, C.R.S.;

(l)(d) The Colorado state veterans trust fund created in section 28-5-709, C.R.S., shall receive one percent of the settlement moneys; AND

(m) The state dental loan repayment program created in article 23 of title 25, C.R.S., shall receive one percent of the settlement moneys; and

(n) The Colorado health service corps fund created in section 25-1.5-506, C.R.S., shall receive one percent of the settlement moneys.

(e) THE PRESCHOOL CASH FUND REFERENCED IN SECTION 22, ARTICLE X, OF THE COLORADO CONSTITUTION, AND CREATED BY IMPLEMENTING LEGISLATION, SHALL RECEIVE THE REMAINING PERCENTAGE OF THE SETTLEMENT MONEYS.

**SECTION 3.** In Colorado Revised Statutes, 39-22-623, **amend** (1)(a)(II)(A) as follows**:**

(1) The proceeds of all money collected under this article 22, less the reserve retained for refunds, shall be credited as follows:

(a)(II)(A) Effective July 1, 1987, an amount equal to twenty-seven percent of the gross state cigarette tax shall be apportioned to incorporated cities and incorporated towns that levy taxes and adopt formal budgets and to counties. For the purposes of this section, a city and county is considered a city. The city or town share shall be apportioned according to the percentage of state sales tax revenues collected by the department of revenue in an incorporated city or town as compared to the total state sales tax collections that may be allocated to all political subdivisions in the state; the county share shall be the same as that which the percentage of state sales tax revenues collected in the unincorporated area of the county bears to total state sales tax revenues that may be allocated to all political subdivisions in the state. The department of revenue shall certify to the state treasurer, at least annually, the percentage for allocation to each city, town, and county, and the department shall apply the percentage for allocation certified in all distributions to cities, towns, and counties until changed by certification to the state treasurer. In order to qualify for distributions of state income tax money, units of local government are prohibited from imposing taxes on any person as a condition for engaging in the business of selling cigarettes, OR ENACTING BANS OF TOBACCO AND NICOTINE PRODUCTS IN ANY FORM. For purposes of this subsection (1)(a)(II), the "gross state cigarette tax" means the total tax before the discount provided for in section 39-28-104 (1). For any city, town, or county that was previously disqualified from the apportionment set forth in this subsection

(1)(a)(II)(A) by reason of imposing a fee or license related to the sale of cigarettes, the city, town, or county is eligible for any allocation of money that is based on an apportionment made on or after July 1, 2019, but not for an allocation of money that is based on an apportionment made before July 1, 2019. THE TOTAL AMOUNT THAT WOULD HAVE BEEN ALLOCATED TO CITIES, TOWNS AND COUNTIES IN EACH FISCAL YEAR BUT FOR THE ADOPTION OF A BAN ON OR AFTER DECEMBER 31, 2021, SHALL BE CERTIFIED TO THE STATE TREASURER BY THE DEPARTMENT OF REVENUE AND SHALL BE CREDITED TO THE PRESCHOOL CASH FUND REFERENCED IN SECTION 22, ARTICLE X, OF THE COLORADO CONSTITUTION.

**SECTION 4.** In Colorado Revised Statutes, 39-26-123, **add** (1)(c) and (3)(c) as follows:

(1)  As used in this section, unless the context otherwise requires:

(c) "TOBACCO AND NICOTINE PRODUCTS" DOES NOT INCLUDE ACCESSORIES SUCH AS ROLLING PAPERS, PIPES, AND VAPE PENS.

(3) For any state fiscal year commencing on or after July 1, 2013, the state treasurer shall credit eighty-five percent of all net revenue collected under this article 26 to the old age pension fund created in section 1 of article XXIV of the state constitution. The state treasurer shall credit to the general fund the remaining fifteen percent of the net revenue, less:

(c) ONE HUNDRED PERCENT OF ALL AVAILABLE NET REVENUE ATTRIBUTABLE TO RETAIL SALES OR USE OF TOBACCO AND NICOTINE PRODUCTS ON OR AFTER JANUARY 1, 2022, WHICH THE STATE TREASURER SHALL CREDIT TO THE PRESCHOOL CASH FUND CREATED PURSUANT TO SECTION 22, ARTICLE X OF THE COLORADO CONSTITUTION.

**SECTION 5.** In Colorado Revised Statutes, **amend** section 39-28-110(1) as follows:

**(1) Distribution of Tax Collected.**  All sums of money received and collected in payment of the tax imposed by the provisions of this article, except license fees received under section 39-28-102 and the moneys collected pursuant to section 39-28-103.5, shall be transmitted to the state treasurer who shall distribute money as follows: Fifteen percent to the general fund, and eighty-five percent to the old age pension fund, EXCEPT THAT, ON AND AFTER JULY 1, 2021, THE STATE TREASURER

SHALL CREDIT FIFTEEN PERCENT TO THE PRESCHOOL CASH FUND REFERENCED IN SECTION 22, ARTICLE X, OF THE STATE CONSTITUTION INSTEAD OF THE GENERAL FUND.

**SECTION 6.** In Colorado Revised Statutes, **amend** section 39-28.5-108 (1) as follows:

(1) **Distribution of Tax Collected**. All sums of money received and collected in payment of the tax imposed by the provisions of this article, except license fees under section 39-28.5-104 and the moneys collected pursuant to 39-28.5-102.5, shall be transmitted to the state treasurer, who shall distribute such money as follows: Fifteen percent to the general fund and eight-five [sic.] percent to the old age pension fund, EXCEPT THAT, ON OR AFTER JULY 1, 2021, THE STATE TREASURER SHALL CREDIT FIFTEEN PERCENT TO THE PRESCHOOL CASH FUND REFERENCED IN SECTION 22, ARTICLE X, OF THE STATE CONSTITUTION INSTEAD OF THE GENERAL FUND.

**SECTION 7.** In Colorado Revised statutes, **add** article 28.6 to title 39 as follows:

## Article 28.6

## Tobacco-derived Nicotine Vapor Product Tax

**39-28.6-101. Declaration.** (1) THE VOTERS OF THE STATE OF COLORADO HEREBY FIND AND DECLARE THAT:

(a) THERE HAS BEEN A SIGNIFICANT INCREASE IN THE USE OF ELECTRONIC CIGARETTES AND SIMILAR TOBACCO -DERIVED NICOTINE VAPOR PRODUCTS AMONG COLORADANS; AND

(b) SUCH PRODUCTS HAVE NOT YET BEEN SUBJECT TO A TAX AS WITH OTHER TOBACCO PRODUCTS PURCHASED AND SOLD IN THE STATE OF COLORADO.

(2) THE VOTERS OF THE STATE OF COLORADO AUTHORIZE A NEW TOBACCO-DERIVED NICOTINE VAPOR PRODUCT TAX IN ADDITION TO THE CURRENT STATE SALES TAX IMPOSED ON RETAIL SALES AND REQUIRE THAT THE GENERAL ASSEMBLY ADOPT A REGULATORY PROGRAM, INCLUDING LICENSING REQUIREMENTS, THAT FACILITATE THE IMPOSITION AND COLLECTION OF THE TAX.

**39-28.6-102. Definitions.** UNLESS THE CONTEXT OTHERWISE REQUIRES, ANY TERMS NOT DEFINED IN THIS ARTICLE 28.6 HAVE THE MEANINGS SET FORTH IN ARTICLE 26 OF THIS TITLE. AS USED IN THIS ARTICLE 28.6, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1) "TOBACCO-DERIVED NICOTINE VAPOR PRODUCT" MEANS A NONCOMBUSTIBLE PRODUCT THAT PRODUCES A VAPOR OR AEROSOL FOR INHALATION FROM THE APPLICATION OF A HEATING ELEMENT TO A LIQUID SUBSTANCE CONTAINING TOBACCO DERIVED NICOTINE

(2)"DEPARTMENT" MEANS THE DEPARTMENT OF REVENUE.

**39-28.6-103. Tax levied.** ON OR AFTER JULY 1, 2021, THERE IS HEREBY IMPOSED UPON ALL SALES OF A TOBACCO-DERIVED NICOTINE VAPOR PRODUCT A TAX AT THE RATE OF TEN PERCENT OF THE AMOUNT OF THE SALE IN ADDITION TO EXISTING STATE AND LOCAL SALES TAXES.

**39-28.6-104. Exempt sales.** THE TOBACCO-DERIVED NICOTINE VAPOR PRODUCT TAX IMPOSED BY SECTION 39-28.6-103 DOES NOT APPLY WITH RESPECT TO ANY TOBACCO-DERIVED NICOTINE VAPOR PRODUCTS THAT, UNDER THE CONSTITUTION AND LAWS OF THE UNITED STATES, MAY NOT BE MADE SUBJECT TO TAXATION BY THIS STATE.

**39-28.6-105. Creation of tobacco-derived nicotine vapor product tax program**. NOTWITHSTANDING ANY OTHER PROVISION OF LAW, THE GENERAL ASSEMBLY SHALL ENACT A REGULATORY STRUCTURE, INCLUDING LICENSING, TO FACILITATE THE COLLECTION OF THE TAX IMPOSED BY THIS ARTICLE 28.6 AND SHALL ADOPT CONFORMING AMENDMENTS TO THIS ARTICLE AS NECESSARY. THE GENERAL ASSEMBLY SHALL ACT NO LATER THAN DECEMBER 31, 2020. THE EXECUTIVE DIRECTOR OF THE DEPARTMENT MAY ADOPT RULES TO IMPLEMENT THE TAX IMPOSED BY THIS ARTICLE 28.6.

**39-28.6-106. Distribution of tax collected**. (1) THE STATE TREASURER SHALL CREDIT THE REVENUE COLLECTED PURSUANT TO THE TAX IMPOSED BY THIS ARTICLE 28.6 TO THE PRESCHOOL CASH FUND CREATED PURSUANT TO SECTION 22 OF ARTICLE X OF THE STATE CONSTITUTION.

(2) THE VOTERS HEREBY FIND AND DECLARE THAT BECAUSE THE SALES AND USE TAX REVENUE GENERATED BY THE SALES AND USE TAX LEVIES PURSUANT TO SECTION 39-26-

106 AND 39-26-202 IS SUFFICIENT TO FUND THE OLD AGE PENSION FUND AS REQUIRED BY ARTICLE XXIV OF THE STATE CONSTITUTION, THE STATE MAY CONSTITUTIONALLY CREDIT ALL REVENUE GENERATED BY THE ADDITIONAL TAX LEVIED PURSUANT TO THIS ARTICLE TO THE PRESCHOOL CASH FUND AS SPECIFIED IN SUBSECTION ONE OF THE SECTION.

**SECTION 8.** THIS INITIATIVE SHALL BE EFFECTIVE UPON PROCLAMATION BY THE GOVERNOR.

# Ballot Title Setting Board

## Proposed Initiative 2019-2020 #315

The title as designated and fixed by the [Title] Board is as follows:

> State taxes shall be increased $6,300,000 annually by an amendment to the Colorado Constitution and a change to the Colorado Revised Statutes concerning a new preschool program that is funded with revenue generated by state taxes on tobacco and nicotine products, and, in connection therewith, requiring the state to create and administer the new preschool program, which must supplement existing preschool programs and funding, and paying for the program by: 1) imposing a new tax on tobacco-derived nicotine vapor products; and 2) reallocating from certain health-related programs and other state purposes portions of the existing revenue from taxes on tobacco and nicotine products and money the state receives from tobacco litigation settlements.

The ballot title and submission clause as designated and fixed by the [Title] Board is as follows:

> Shall state taxes be increased $6,300,000 annually by an amendment to the Colorado Constitution and a change to the Colorado Revised Statutes concerning a new preschool program that is funded with revenue generated by state taxes on tobacco and nicotine products, and, in connection therewith, requiring the state to create and administer the new preschool program, which must supplement existing preschool programs and funding, and paying for the program by: 1) imposing a new tax on tobacco-derived nicotine vapor products; and 2) reallocating from certain health-related programs and other state purposes portions of the existing revenue from taxes on tobacco and nicotine products and money the state receives from tobacco litigation settlements?

JUSTICE HART, dissenting.

¶36     I agree with the majority that "'[t]he Title Board is vested with considerable discretion in setting the title and the ballot title and submission clause,' and we will reverse the Board's decision only when a title is insufficient, unfair, or misleading." Maj. op. ¶ 6 (quoting *In re Title, Ballot Title & Submission Clause for 2013–2014 #90*, 2014 CO 63, ¶ 8, 328 P.3d 155, 159). But because this title *is* insufficient, unfair, and misleading, I would reverse the decision of the Title Board. Accordingly, I respectfully dissent.

¶37     Because my disagreement with the majority concerns the inclusion in Initiative 2019–2020 #315 ("Initiative #315") of a penalty imposed on local jurisdictions that ban any form of tobacco or nicotine, I will describe the initiative and the penalty provision's placement within it here. The text of Initiative #315 fills nearly seven pages. Section 3 of the initiative begins near the bottom of the fourth page and provides:

> SECTION 3. In Colorado Revised Statutes, 39-22-623, amend (1)(a)(II)(A) as follows:
>
> (1) The proceeds of all money collected under this article 22, less the reserve retained for refunds, shall be credited as follows:
>
> (a)(II)(A) Effective July 1, 1987, an amount equal to twenty-seven percent of the gross state cigarette tax shall be apportioned to incorporated cities and incorporated towns that levy taxes and adopt formal budgets and to counties. For the purposes of this section, a city and county is considered a city. The city or town share shall be apportioned according to the percentage of state sales tax revenues

1

collected by the department of revenue in an incorporated city or town as compared to the total state sales tax collections that may be allocated to all political subdivisions in the state; the county share shall be the same as that which the percentage of state sales tax revenues collected in the unincorporated area of the county bears to total state sales tax revenues that may be allocated to all political subdivisions in the state. The department of revenue shall certify to the state treasurer, at least annually, the percentage for allocation to each city, town, and county, and the department shall apply the percentage for allocation certified in all distributions to cities, towns, and counties until changed by certification to the state treasurer. In order to qualify for distributions of state income tax money, units of local government are prohibited from imposing taxes on any person as a condition for engaging in the business of selling cigarettes, OR ENACTING BANS OF TOBACCO AND NICOTINE PRODUCTS IN ANY FORM. For purposes of this subsection (1)(a)(II), the "gross state cigarette tax" means the total tax before the discount provided for in section 39-28-104 (1). For any city, town, or county that was previously disqualified from the apportionment set forth in this subsection (1)(a)(II)(A) by reason of imposing a fee or license related to the sale of cigarettes, the city, town, or county is eligible for any allocation of money that is based on an apportionment made on or after July 1, 2019, but not for an allocation of money that is based on an apportionment made before July 1, 2019. THE TOTAL AMOUNT THAT WOULD HAVE BEEN ALLOCATED TO CITIES, TOWNS AND COUNTIES IN EACH FISCAL YEAR BUT FOR THE ADOPTION OF A BAN ON OR AFTER DECEMBER 31, 2021, SHALL BE CERTIFIED TO THE STATE TREASURER BY THE DEPARTMENT OF REVENUE AND SHALL BE CREDITED TO THE PRESCHOOL CASH FUND REFERENCED IN SECTION 22, ARTICLE X, OF THE COLORADO CONSTITUTION.

Ballot Title #315.

¶38    Thus, if Initiative #315 were passed by the voters in this November's election, any local jurisdiction that enacted a ban "of tobacco and nicotine products in any form" would lose its right to any share of the "gross state cigarette tax."

2

And yet nothing in the title set by the Title Board alerts voters to that very significant impact.

¶39 The only words in the title set by the Board that could be said to remotely relate to this provision is the statement that the preschool program created by the initiative would be funded by "reallocating from . . . other state purposes portions of the existing revenue from taxes on tobacco and nicotine products." *Id.* While a title need not include an exhaustive list of specific impacts an initiative will have, this reference to reallocation from "other state purposes" is not, to my mind, enough to meet even the low bar we apply in reviewing titles set by the Board. For this reason, I conclude that the title set for Initiative #315 is insufficient. It is also unfair and misleading and does not satisfy the requirements of our single subject rule.

¶40 The General Assembly has specified that the single subject rule serves two purposes. First, the rule is meant to prohibit including multiple unrelated subjects in a single initiative, and "especially the practice of putting together in one measure subjects having no necessary or proper connection, for the purpose of enlisting in support of the measure the advocates of each measure, and thus securing the enactment of measures that could not be carried upon their merits." § 1-40-106.5(1)(e)(I), C.R.S. (2019); *see In re Title, Ballot, Title & Submission Clause, & Summary Pertaining to Proposed Initiative on Parental Choice in Educ.*, 917 P.2d 292,

3

294 (Colo. 1996) (substantially tracking the language of section 1-40-106.5(1)(e)(I)); *In re Proposed Initiative "Public Rights in Waters II"*, 898 P.2d 1076, 1079 (Colo. 1995) (noting that "the single subject requirement precludes the joining together of multiple subjects into a single initiative in the hope of attracting support from various factions"); *see also In re Title, Ballot Title & Submission Clause for 2013–2014 #76*, 2014 CO 52, ¶ 8, 333 P.3d 76, 79 (noting that the single subject rule "prevents the proponents from combining multiple subjects to attract a 'yes' vote from voters who might vote 'no' on one or more of the subjects if they were proposed separately"), *disapproved of on other grounds by In re Title, Ballot Title & Submission Clause for 2019–2020 #3*, 2019 CO 57, ¶ 38, 442 P.3d 867, 873.

¶41    Initiative #315 is a perfect example of just such an effort. People who work in the vaping industry would likely be very supportive of an initiative that simply penalized local jurisdictions that placed any ban on tobacco or nicotine products. But it is not hard to discern that the imposition of a cigarette tax penalty on any local jurisdiction that bans nicotine or tobacco "in any form" would be harder to enact on its own than when linked to funding for new preschool programs. By combining these two different subjects into a single initiative, the proponents will garner support that they could not muster for the cigarette tax penalty alone. This is precisely what the single subject rule is designed to prevent.

4

¶42 Moreover, the proponents combine these subjects in a way that runs afoul of the second purpose of the single subject requirement, which is "[t]o prevent surreptitious measures and apprise the people of the subject of each measure by the title, that is, to prevent surprise and fraud from being practiced upon voters." § 1-40-106.5(1)(e)(II); *see also In re Title, Ballot Title & Submission Clause for 2011–2012 #3*, 2012 CO 25, ¶ 11, 274 P.3d 562, 566 (explaining that "the single subject rule helps avoid 'voter surprise and fraud occasioned by the inadvertent passage of a surreptitious provision "coiled up in the folds" of a complex initiative'" (quoting *In re Title, Ballot Title & Submission Clause for Proposed Initiative 2001–02 #43*, 46 P.3d 438, 442 (Colo. 2002))); *In re Title, Ballot Title & Submission Clause for 2007–2008, #17 (New State Dep't & Elected Bd. for Envtl. Conservation)*, 172 P.3d 871, 873 (Colo. 2007) (explaining that a title must give sufficient information about the contents of an initiative "so that surreptitious measures that could result in voter surprise or fraud are not placed on the ballot"); *In re Title, Ballot Title & Submission Clause, & Summary for 1997–98 #30*, 959 P.2d 822, 825 (Colo. 1998) (noting that "[t]he risk of 'uninformed voting caused by items concealed within a lengthy or complex proposal' is what the single subject requirement seeks to avoid" (quoting *"Public Rights in Waters II"*, 898 P.2d at 1079)).

¶43 The cigarette tax penalty that Initiative #315 imposes on jurisdictions that seek to ban any form of nicotine is buried on page four of the initiative in a complex

statutory paragraph. It is not hard to imagine a voter who would be surprised to learn that, in signing a petition or voting for a preschool program—even one funded by tobacco and nicotine taxes—she had made it more costly for her town to ban the types of flavored vape products that have led to epidemic levels of teenage vaping. *See, e.g.*, Nandeeni Patel & Diana Quintero, *The Youth Vaping Epidemic: Addressing the Rise of e-Cigarettes in Schools*, Brookings Inst. (Nov. 22, 2019), https://www.brookings.edu/blog/brown-center-chalkboard/2019/11/22 /the-youth-vaping-epidemic-addressing-the-rise-of-e-cigarettes-in-schools/ [https://perma.cc/J26A-9Y2U] (discussing the public health crisis of youth vaping and noting that flavored vaping products were the number one reason that young people used the products).

¶44 The majority asserts "that a knowledgeable voter would understand that prohibiting the sale of tobacco and nicotine products in his or her locality would result in a loss of tax revenue derived from the sales of such products." Maj op. ¶ 20. But the initiative does much more than direct tax revenue derived from the sale of a banned product away from the locality that enacts that ban. Instead, if a local jurisdiction sought to ban, for example, only the sale of particular flavors of nicotine vaping products that have been shown to be especially attractive to children, that jurisdiction would lose its entitlement to any portion of the state tax on cigarettes—products that the jurisdiction did not ban.

6

¶45 As the majority says today, and as we have said many times before, "[w]e will reverse the Title Board's decision only if a title is insufficient, unfair, or misleading." *2013–2014 #90*, ¶ 8, 328 P.3d at 159. Implicit in that statement is that we *will* reverse the Title Board when a title is insufficient, unfair, or misleading. I fear that this case demonstrates that our deference has become too expansive. I am confident that many citizens will sign petitions to put this initiative on the ballot, and will vote for it in November if it makes the ballot, who would oppose it if they knew that one of its consequences would be to make a ban on nicotine or tobacco "in any form" a very costly choice for their local communities.

¶46 Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE HOOD joins in this dissent.